NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 07a0375n.06
Filed: June 5, 2007

No. 06-1023

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | |
|---|---|
| DOBSON INDUSTRIAL, INC., | ) |
| | ) **ON APPEAL FROM THE** |
| *Plaintiff-Appellant,* | ) **UNITED STATES DISTRICT** |
| | ) **COURT FOR THE EASTERN** |
| | ) **DISTRICT OF MICHIGAN** |
| v. | ) |
| | ) |
| IRON WORKERS LOCAL UNION | ) **OPINION** |
| No. 25, INTERNATIONAL | ) |
| ASSOCIATION OF BRIDGE, | ) |
| STRUCTURAL, ORNAMENTAL AND | ) |
| REINFORCING IRON WORKERS, | ) |
| AFL-CIO, | ) |
| | ) |
| *Defendant-Appellee.* | ) |

BEFORE: BOGGS, Chief Judge; DAUGHTREY, Circuit Judge; and MILLS, District Judge.[*]

RICHARD MILLS, District Judge.

Plaintiff-Appellant Dobson Industrial, Inc. filed a complaint in an attempt to

enjoin a grievance filed by Defendant-Appellee Iron Workers Local Union No. 25.

_____

[*]The Honorable Richard Mills, United States District Judge for the Central District of Illinois, sitting by designation.

In granting the Defendant's motion for summary judgment, the district court held that the grievance was substantively arbitrable and that the Joint Grievance Board's decision was not preempted by the National Labor Relations Act. Finding no error, we affirm.

## I. BACKGROUND

Plaintiff-Appellant Dobson Industrial, Inc. and Defendant-Appellee Iron Workers Local Union No. 25 ("Local 25" or "the Union") are parties to a Structural Agreement which governs the erection and installation of structural steel. The Agreement is between the Union and "the Associated General Contractors of America, Greater Detroit Chapter, Inc., the Great Lakes Fabricators and Erectors Association, and the Michigan Conveyor Manufacturers Association, Inc., (Association), representing its members (Employer or Employers)." Dobson was a member of the Great Lakes Fabricators and Erectors Association. At the time of the grievances, Dobson had three owners: the trust of James Dobson, and individuals Norman Vlk and Dale Bash.[1] Dobson's business consists of steel fabrication, steel erection services, rigging services, door services and storage services. In the course of its business, Dobson regularly employs about twelve members of Local 25 on an

_____

[1]Dobson states that following the death of Norman Vlk on October 8, 2005, his shares passed to his son, Christopher Vlk.

hourly basis.

A collective bargaining agreement ("CBA") exists between Dobson and the Union, which provides for a joint grievance board ("JGB") "to hear and decide all grievances regarding the interpretation of this Agreement or conditions of employment existing between the Association (including any Employer members of the Association) or any other employer signatory to this Agreement and the Union." The CBA was amended, effective June 1, 2004, to include Article 30(E), which provides, "A signatory Employer may not avoid application of this Agreement by double breasting or similar device."

In October 2004, Dobson submitted a bid to the National Gypsum Company for a project that required the removal and installation of a dust collector system. Later that month, Local 25 learned that another company, IMM, Inc., was installing the dust collection system at the National Gypsum Project. According to the Union, this job involved work which was covered by the Structural Agreement. The IMM employees on the National Gypsum Project were not members of Local 25.

On November 4, 2004, Local 25 filed two identical grievances alleging that "Dobson . . . is operating a non-union alter ego named IMM, Inc. and using IMM to perform bargaining unit work at the National City Gypsum facility in violation of virtually every provision of the collective bargaining agreement." The Union

-3-

requested the following relief: "[a]ll lost wages and benefits because of the contract violation at the National City Gypsum facility, cease operation of the non-union alter ego, IMM; repayment of targeting money received by Dobson . . . and suspension of all target monies pendings [sic]." The Union notes that the grievance did not seek an accretion of IMM employees into the Local 25-represented bargaining unit at Dobson, that IMM be bound to the Structural Agreement or that IMM be held liable for Dobson's contract violation. At the time the grievances were filed, the shareholders of IMM were the trust of James E. Dobson, and the individuals, Dale A. Bash and Christopher K. Vlk.

On December 15, 2004, a hearing was held before the JGB. In accordance with Article 31 of the Structural Agreement, the JGB consisted of three Union representatives and three representatives of the Association. Local 25 claims that it presented evidence of common ownership between Dobson and IMM; shared management between Dobson and IMM; that work at the Gypsum Project was covered by the Structural Agreement and that work on the Gypsum Project involved approximately 600 hours of structural iron work.

The Union claims that Chris Vlk, President of IMM and Director of Operations for Dobson, stated at the hearing that he served as President of IMM without pay; that Dobson and IMM have jointly solicited bids and provided marketing services; that

work has been traded back and forth between Dobson and IMM in accordance with which party is best able to perform the work; that IMM performed structural work when Dobson was unable to solicit work from customers requiring low-wage workers; and that Dobson has diverted work to IMM during the bidding process. Vlk also complained about the high wage and benefit rates in the Structural Agreement. Dobson's attorney also appeared at the hearing and presented evidence to the JGB.

Dobson disputes some of the above allegations. It claims that Chris Vlk was compensated for his services as President at IMM in the form of stock options. Moreover, Dobson and IMM have never jointly solicited bids on structural iron projects, structural work has not been traded back and forth between Dobson and IMM in accordance with which party is best able to perform the work, and Dobson has never diverted work to IMM during the bidding process. Vlk stated that the two companies remain independent and distinct. Dobson claims those are just some of the erroneous factual assertions made by Local 25.

Dobson contends that the Union's most egregious misrepresentation concerns Vlk's role at the JGB hearing. As Dobson's Director of Operations, Vlk attended the JGB hearing solely for the purpose of contesting jurisdiction. Dobson consistently maintained that "the subject and circumstances presented by the Grievance are not arbitrable under the contract" and requested "that the JGB decline to exercise any

authority over the grievance, and leave the parties to explore, if they choose, other alternatives."

Article 31(B) of the CBA provides in pertinent part, "Within seven (7) days after the grievance has been heard by the Joint Board, the Board will issue its decision." The original complaint in this case was filed on December 13, 2004, which was two days before the JGB hearing. A first amended complaint was filed on December 22, 2004. On January 13, 2005 (29 days after the hearing), having received no response or decision from the JGB, Dobson filed its second amended complaint, to reflect the fact that the hearing had been held and to complain about the tardiness of the JGB decision. Dobson also requested that the court quash any decision of the JGB. On January 28, 2005, the JGB issued its decision granting Local 25's grievance filed under the Structural Agreement and dismissing the grievance filed under the Rigging Agreement. Specifically, the JGB concluded that "a close business relationship exists between Respondent Dobson and IMM, Inc., sufficient to find that an alter-ego situation exists." The Union was awarded lost wages and benefits.

Local 25 states that during this litigation, each of the facts found by the JGB was confirmed to be true. Moreover, Local 25's members would have performed much of the work on the National Gypsum Project if Dobson had done the job.

On February 7, 2005, Local 25 filed with the district court its counterclaim to enforce final and binding grievance decision. On August 26, 2005, Dobson filed its motion for summary judgment and Local 25 filed a motion to enforce final and binding grievance decision. The district court granted Local 25's motion to enforce and denied Dobson's motion for summary judgment. This appeal followed.

Dobson raises several issues on appeal. It alleges that the district court erred in holding that the decision of the JGB was not preempted by the National Labor Relations Act ("NLRA"). It further contends that the district court erred in declining to vacate the JGB's decision which disregarded the law on alter ego. Dobson also asserts that the JGB's decision exceeded that entity's powers by substantially affecting the rights of an independent third party. It also claims that the JGB's decision was fundamentally unfair in part because it was not appealable. Finally, Dobson alleges that the district court should have vacated the JGB's decision because it was untimely.

## II. DISCUSSION

Section 301(a) of the Labor Management Relations Act authorizes district courts to hear "[s]uits for violation of contracts between an employer and a labor organization." 29 U.S.C. § 185(a). This is an appeal from a final order of the district court dated November 7, 2005. We have jurisdiction pursuant to 28 U.S.C. § 1291.

In cases in which the district court enforces or refuses to vacate an arbitration award, we review findings of fact only for clear error. Questions of law are reviewed *de novo*. Cleveland Elec. Illuminating Co. v. Utility Workers Local 227, 440 F.3d 809, 812 (6th Cir. 2006).

**(A)**

Dobson contends that the district court erred as a matter of law when it declined to vacate the JGB's decision which it asserts was preempted by the NLRA, 29 U.S.C. § 151 et seq. Section 9(b) of the NLRA authorizes the National Labor Relations Board ("NLRB") to determine "the unit appropriate for the purposes of collective bargaining." 29 U.S.C. § 159(b). Dobson alleges the JGB's decision that the IMM was an alter ego of Dobson, thereby entitling Local 25 members to "lost wages and benefits equal to those that would have been paid had the work been performed by Dobson at the National City Gypsum Facility under the Structural Agreement," rests on an impermissible conclusion that IMM's employees are an extension of Dobson and, therefore, covered by Local 25's representation agreement. Dobson asserts that the JGB's conclusion involves an accretion of IMM's employees into the representative unit of the Union, a decision that Dobson claims falls within the exclusive province of the NLRB. Dobson cites Lexington Cartage Co. v. International Brotherhood of Teamsters, 713 F.2d 194 (6th Cir. 1983), for the general

proposition that the NLRB has exclusive jurisdiction for adjudicating questions of representation or unfair labor practices.

The Union claims that Lexington Cartage Co. is inapposite. That case concerns whether the NLRB has jurisdiction to determine if an employer has a duty to bargain with a union when there is an issue regarding whether the union has the support of a majority of the employees. 713 F.2d at 195. Unlike this case, Lexington Cartage Co. does not involve a grievance, arbitrability, or double-breasting.

Dobson further contends that its argument is supported by decisions of the NLRB. See Asbestos Carting Corp. and Local 813, 302 NLRB 197 (1991) ("These single employer/alter ego and accretion issues involve application of statutory policy, standards, and criteria and thus are matters for decision of the Board rather than an arbitrator."). Dobson claims the issues here should not be decided by an arbitrator. It maintains that Local 25 impermissibly sought a ruling from the JGB that IMM is Dobson's alter ego, a determination that must be made by the NLRB. Dobson contends that because the JGB lacked jurisdiction to decide the issue, the district court should have vacated its decision.

Local 25 asserts this case differs from Asbestos Carting Corp. because in that case, the union requested that the NLRB recognize it as the bargaining representative for the employer's employees. 302 NLRB at 197. Conversely in this case, Local 25

did not demand recognition of IMM's employees, nor did it request that the JGB decide a representation issue. Local 25 contends, therefore, that because a representation issue was not raised by the grievance or the decision of the JGB in this case, NLRA preemption is not an issue in this case.

Dobson alleges that the end result of having an arbitrator decide these issues is that there is neither finality nor any guidance to the parties as to how to behave in the future. Dobson speculates that until the issue is submitted to the NLRB for a final determination, the Union will continue to file grievances each time IMM successfully bids a project.[2] According to Dobson, the result is that Local 25 will have the power to decide what entities, like IMM,[3] are represented by the parties' CBA. Because such a decision is within the jurisdiction of the NLRB, Dobson requests that the decision of the district court and JGB be vacated.

---

[2]In a letter of supplemental authority, Dobson states that a second suit between the parties was filed by it following receipt of another grievance from the Union premised solely on the "alter ego" theory. That case is before Chief Judge Friedman in the Eastern District of Michigan. USDC-EDM Case No. 05-74610: Dobson Industrial, Inc. vs. Iron Workers Local Union No. 25, International Association of Bridge, Structural, Ornamental and Reinforcing Iron Workers, AFL-CIO.

[3]In its letter of supplemental authority, Dobson also states that IMM, Inc., has filed a § 8(e) Charge and Position Statement with the NLRB. Case No. 7-CE-61: IMM, Inc., Charging Party vs. Iron Workers Local Union No. 25, International Association of Bridge, Structural, Ornamental and Reinforcing Iron Workers, Respondent Union.

The Union alleges there is no support for Dobson's claim that the JGB's decision was preempted by the NLRA because it accreted IMM's employees into the bargaining unit represented by Local 25 at Dobson. The Union notes that the JGB ordered Dobson to pay it lost wages and benefits. The decision did not accrete IMM's employees into Local 25's bargaining unit at Dobson. The Union claims that IMM employees are not even discussed in the JGB's decision. IMM's employees were not represented by Local 25 when the grievance was filed and remain non-union today.

Local 25 further contends that even if a representation issue was implicated in this case, Dobson's claim that all matters related to such issues are within the exclusive jurisdiction of the NLRB is inconsistent with the Supreme Court's holding in Carey v. Westinghouse Electric Corp., 375 U.S. 261 (1964). That case involved a dispute between an employer and two unions over whether certain employees in one union were doing the work of the employees represented by another union. Id. at 262. The employer refused to arbitrate on the basis that the dispute involved a representation matter for the NLRB. Id. at 262-63. The Court concluded that whether the dispute involved work assignment or representation, there was no bar to the use of the arbitration procedure. Id. at 272. Thus, even if this case did involve a representation issue, the Union claims there was no NLRA preemption.

Dobson further alleges that the result of the JGB's decision is that every time employees of IMM perform a job that Local 25 deems to be covered by the CBA, Local 25 enjoys the rewards and enrichment as if IMM's employees are Union members, despite not offering the protections and benefits of membership to these same employees from which Local 25's benefit is derived. Local 25 is awarded wages and benefits, while the IMM employees who actually perform the work do not enjoy pensions and other benefits of union membership. Dobson contends, moreover, that this serves effectively to require it to pay Local 25 for work done by employees that are not covered by their collective bargaining agreement and that may not be members of the same bargaining unit even if they are Local 25 members. Dobson asserts this violates the NLRA because the NLRB is authorized to determine these matters. Dobson asks this Court to vacate the district court's decision on the basis of lack of jurisdiction.

We agree with the district court's conclusion that the JGB's decision was not preempted by the NLRA. This case concerns a grievance that the Union filed wherein it sought lost wages and benefits from the signatory contractor for breach of the parties' Structural Agreement. Any determination as to the contract interpretation would not affect the Union's status as bargaining representative for any particular employees. As the district court observed, "There were no third parties involved in

-12-

being able to interpret this contract," though certain facts about IMM were relevant to the overall inquiry. This case did not involve a demand for recognition of IMM's employees, nor did it concern a request that the JGB decide a representation issue.

Even if this case involved a representation issue, we would not necessarily be without jurisdiction. See International Bhd. of Elec. Workers, Local 71 v. Trafftech, Inc., 461 F.3d 690, 695 (6th Cir. 2006). In Trafftech, this Court observed:

> Since Carey, this court has drawn the following dichotomy between disputes implicating the exclusive initial jurisdiction of the Board . . . and those implicating the concurrent jurisdiction of the federal courts under § 301. When a dispute is "primarily representational" under § 7 or § 8 of the National Labor Relations Act, "simply referring to the claim as a 'breach of contract' [is] insufficient for the purposes of § 301 federal courts' jurisdiction," but "matter[s] primarily of contract interpretation, whi[ch] potentially implicat[e] representational issues," remain within the federal courts' § 301 jurisdiction.

Id. at 694-95 (citations omitted). Thus, contract disputes which touch on representational issues may be subject to federal jurisdiction.

Like the district court, we believe that the JGB's decision drew its essence from the contract. The CBA provided that Dobson "may not avoid application of this Agreement by double breasting or similar device." The JGB reasonably determined that this language forbade using an alter ego. Given that the Structural Agreement has a broad arbitration clause, the Union's grievance against Dobson was arbitrable. This is particularly true in light of the federal labor policy that strongly favors

-13-

arbitration.  Detroit Typographical Union v. Detroit Newspaper Agency, 283 F.3d 779, 786 (6th Cir. 2002).  Accordingly, we conclude the district court correctly determined that the JGB did not exceed its jurisdiction.

**(B)**

Dobson next alleges that assuming that the issue of alter ego was properly before the JGB, the JGB's decision was also made in manifest disregard of this court's precedent on alter ego.  An arbitration decision must be set aside when the decision "fl[ies] in the face of clearly established legal precedent." Lynch v. Johnson, 70 F.3d 418, 421 (6th Cir. 1995).  "When faced with questions of law, an arbitration panel does not act in manifest disregard of the law unless (1) the applicable legal principle is clearly defined and not subject to reasonable debate; and (2) the arbitrators refused to heed that legal principle." Id.

The test for the alter ego doctrine is "whether the two enterprises have substantially identical management, business, purpose, operation, equipment, customers, supervision and ownership." National Labor Relations Board v. Fullerton Transfer & Storage Ltd., Inc., 910 F.2d 331, 336 (6th Cir. 1990) (citations omitted). Dobson asserts there are many factors which demonstrate the independence of IMM from Dobson.  The two entities have only six common customers.  As for the type of business, the only two areas of overlap between Dobson and IMM are structural

-14-

services and steel fabrication service, both of which amount to less than ten percent of IMM's business. Dobson contends, moreover, that IMM regularly subcontracts to Dobson and has used Dobson's services for eleven separate projects in the last two years. Dobson alleges that the two companies have separate business locations, management, labor policies, bidding structure, customers and work. Moreover, IMM and Dobson do not share any common equipment. Based on the foregoing, Dobson claims it is impossible to conclude that IMM is Dobson's alter ego for any purpose.

The Union contends that the district court properly found that the JGB's decision drew its essence from the terms of the Structural Agreement. "A double-breasted, or dual shop, employer maintains one company that is a signatory to a CBA while maintaining a second, non-union company in the same line of work in order to utilize non-union labor." Becker Electric Co. v. Int'l Bhd. of Elec. Workers, Local No. 212, 927 F.2d 895, 896 (6th Cir. 1991).

Local 25 notes that Dobson and IMM have common ownership, common management and common directors. They also had a common officer. The Union further alleges that IMM began its operations with two loans from Dobson's banker to Dobson and IMM. Dobson also purchased equipment for IMM. Dobson has an iron worker division that erects and installs structural steel; IMM has a field services department that erects and installs structural steel. The Union notes that Dobson and

IMM operate in the same geographical location and have at least a few common customers. Based on these factors, Local 25 contends that Dobson operates a non-union company, IMM, to avoid the application of the Structural Agreement. Dobson asserts that Local 25 has misconstrued and/or mischaracterized many of these factors.

After reviewing the record, we conclude that the district court correctly sustained the arbitrator's decision. Examining whether a party to an arbitration agreement with a double-breasting clause has an "alter ego" is a reasonable way to determine whether that party is violating that clause. In other words, the inquiry undertaken by the JGB demonstrates that it was "arguably construing" the agreement. Accordingly, the district court properly held that the JGB's decision must be sustained. Mich. Family Res., Inc. v. SEIU Local 517M, 475 F.3d 746, 756 (6th Cir. 2007) (en banc).

**(C)**

Dobson contends the district court erred by failing to vacate the JGB's decision when it exceeded its powers by substantially affecting the rights of an independent third party. A federal court may vacate an arbitration award if "the arbitrators exceeded their powers." 9 U.S.C. § 10(a)(4). This court has observed, "Some circuits have specifically held that arbitrators exceed their powers when they determine rights and obligations of individuals who are not parties to the arbitration proceedings."

NCR Corp. v. Sac-Co., Inc., 43 F.3d 1076, 1080 (6th Cir. 1995) (citations omitted). Dobson claims that in this case, the JGB exceeded its powers by substantially impairing the right of IMM to subcontract with Dobson. Moreover, other companies have expressed concern about doing business with IMM during this ongoing labor dispute. Dobson claims that because the JGB has substantially impaired the rights of an entity that is not a party to the CBA between Dobson and Local 25, the district court erred in failing to vacate the decision.

We conclude the district court correctly determined that the JGB did not exceed its powers by substantially affecting the rights of an independent third party. While the JGB's decision may affect IMM's ability to subcontract with Dobson, Article 30(E) of the Structural Agreement prohibits Dobson from double-breasting. If Dobson's argument were accepted, then Article 30(E) would have little meaning. Enforcement of a contractual restriction on the actions of one party is not invalid because the restrictions affect the party's participation in the marketplace. Dobson's agreement to the CBA here did not affect any *rights* of IMM; it merely prevented Dobson from agreeing to certain dealings with IMM. The JGB's decision simply enforced the way in which Dobson itself had limited the freedom of its partial alter ego.

**(D)**

-17-

Dobson next contends that the district court erred by failing to vacate the decision of the JGB when Dobson was allowed no right to appeal that decision. Dobson further alleges that it was otherwise denied fundamental fairness. The district court erroneously found that Dobson could have appealed the JGB's decision to an arbitration panel. Article 31(C) of the parties' CBA allows either party to appeal only upon a deadlock decision of the JGB. The Union claims that the error was harmless. "The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties." Fed. R. Civ. P. 61

Dobson also alleges that the arbitrators were guilty of misconduct that amounted to a denial of fundamental fairness as to the proceeding, in violation of the Federal Arbitration Act, 9 U.S.C. § 10(a)(3). Dobson claims there is no guidance given to members of the JGB regarding how to make a decision. Moreover, the hearing was informal, no evidence was formally presented, no witnesses were sworn and no record or transcript maintained.

"Arbitrators are not bound by formal rules of procedure and evidence, and the standard for judicial review of arbitration proceedings is merely whether a party to arbitration has been denied a fundamentally fair hearing." Nat'l Post Office Mailhandlers v. U.S. Postal Service, 751 F.2d 834, 841 (6th Cir. 1985). Both sides

presented evidence and arguments at the hearing. If Dobson wanted a more formal or structured hearing process, it could have sought to negotiate one as part of the Structural Agreement.

Dobson also contends that the district court erred by failing to vacate the JGB's decision which was tainted by partiality when half of the JGB's members were direct competitors of Dobson. Article 31(A) of the CBA provides, "A Joint Grievance Board will be established consisting of three (3) individuals appointed by the Association and three (3) individuals appointed by the Union." Dobson notes that the interests of both the Association and Union were aligned against its interests in that both the Association and Union had an interest in equalizing wages. Dobson claims that because of these competing interests, it did not receive unbiased and neutral consideration by the JGB.

The Union notes that Dobson's attorney admitted she was not aware of any specific evidence of bias or prejudice on the part of JGB members. Moreover, Dobson agreed to a JGB comprised of three management members and three union members. It is too late to object to those terms now.

We conclude that the district court's error regarding the right to appeal was harmless. It is mentioned almost in passing at the very end of the hearing and does not appear to be the basis of the court's ruling. Dobson's other arguments about

procedural unfairness and the make-up of the JGB are also unpersuasive. The parties agreed to the terms in the Structural Agreement. Dobson could have objected if it had problems with any provisions.

**(E)**

Dobson also contends that the district court committed error by failing to vacate the untimely decision of the JGB, which Dobson claims was issued after the time period permitted under the parties' CBA. Article 31(B) provides that the JGB will issue a decision within seven days after the grievance has been heard. In this case, the JGB issued its decision 44 days after the hearing. Citing Jones v. St. Louis-San Francisco Ry. Co., 728 F.2d 257 (6th Cir. 1984), Dobson asserts the JGB exceeded its authority and the district court erred in failing to vacate the untimely decision. In Jones, the arbitration agreement provided that the board would render its decision within fifteen days of the hearing date. 728 F.2d at 264. The court therefore considered whether the parties' agreement stated that the arbitrators would lose jurisdiction if they rendered a decision more than fifteen days after the hearing date. Id. at 265. After determining there was no such provision, the court concluded that the board retained jurisdiction to resolve the dispute "until a reasonable time thereafter" the fifteen-day period. Id. The court held that because the fourteen-month delay in Jones was unreasonable, the board lost jurisdiction to resolve the dispute.

-20-

Id.

In this case, Dobson notes that in filing its second amended complaint on January 13, 2005–almost one month after the JGB hearing–it clearly objected to the JGB's jurisdiction based on its failure to issue a timely decision. Dobson alleges, moreover, that the delayed decision caused it and IMM irreparable injury to their business reputations.

The Union alleges that the district court correctly held that the seven-day provision is not a mandatory term which extinguished the JGB's jurisdiction. Moreover, Local 25 claims the court properly determined that a decision issued 44 days after the hearing did not constitute unreasonable delay.

In this case, the CBA does not provide that the JGB will lose jurisdiction by failing to issue a decision within seven days of the hearing. We find that a decision rendered 37 days thereafter was reasonable. Although Dobson alleges in a conclusory fashion that the delay caused irreparable injury to its business reputation, Dobson has not shown that it was prejudiced by the late decision. We conclude that because the JGB's decision was issued within a reasonable time after the hearing, the JGB did not exceed its authority under the CBA.

For the reasons set about above, we affirm the judgment of the district court.