RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 08a0261p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

TOTES ISOTONER CORPORATION,

        *Plaintiff-Appellee,*

    *v.*

INTERNATIONAL CHEMICAL WORKERS UNION
COUNCIL/UFCW LOCAL 664C,

        *Defendant-Appellant.*

No. 07-3577

---

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 04-00849—Susan J. Dlott, District Judge.

Argued: March 13, 2008

Decided and Filed: July 8, 2008[*]

Before: CLAY and McKEAGUE, Circuit Judges; BOYKO, District Judge.[**]

---

## COUNSEL

**ARGUED:** Randall Vehar, ICWUC/UFCW LEGAL DEPARTMENT, Akron, Ohio, for Appellant. Lawrence J. Barty, TAFT, STETTINIUS & HOLLISTER, Cincinnati, Ohio, for Appellee. **ON BRIEF:** Randall Vehar, Robert W. Lowrey, ICWUC/UFCW LEGAL DEPARTMENT, Akron, Ohio, for Appellant. Lawrence J. Barty, Paula Jean Dehan, TAFT, STETTINIUS & HOLLISTER, Cincinnati, Ohio, for Appellee.

    CLAY, J., delivered the opinion of the court, in which BOYKO, D. J., joined. McKEAGUE, J. (pp. 14-17), delivered a separate dissenting opinion.

---

[*] This decision was originally issued as an "unpublished decision" filed on July 8, 2008. The court has now designated the opinion as one recommended for full-text publication.

[**] The Honorable Christopher A. Boyko, United States District Judge for the Northern District of Ohio, sitting by designation.

_____

**OPINION**

_____

CLAY, Circuit Judge.  Defendant, International Chemical Workers Union Council/UFCW Local 664C ("Union"), appeals the district court's order granting the motion of Plaintiff, totes»Isotoner Corporation, to vacate a supplemental labor arbitration award.  For the reasons that follow, we **AFFIRM** the judgment of the district court.

**BACKGROUND**

Totes»Isotoner Corporation ("the Company") is an employer that makes and markets umbrellas, gloves and other weather-related accessories, with its principal place of business located in Butler County, Ohio.  The Union is an unincorporated labor organization that is the exclusive representative of production and maintenance employees at the Company's distribution center in Butler County.  Over the years, the Union and the Company have been signatories to a series of collective bargaining agreements, one of which was effective April 27, 1998 through April 26, 2002.

**A.        1998 Collective Bargaining Agreement**

On April 27, 1998, the Union and the Company executed a collective bargaining agreement ("CBA") which memorialized "their agreement with respect to rates of pay, hours of work, and conditions of employment to be observed by the Company, the Union and employees covered by this agreement; [and provided] procedures for equitable adjustment of grievances . . . ." (J.A. at 30)

1.        *Health Benefits*

Section 1(a) of Appendix C to the 1998 CBA outlined the Company's obligations with respect to medical, dental, life and accidental death insurance coverage for Union employees during the lifetime of the agreement.  Appendix C provided that "[c]overage for . . . benefits will be as outlined in the Totes»Isotoner Umbrella of Benefits plan and will be available to employees after 60 working days." (J.A. at 56)  Under the "Umbrella of Benefits" plan, both union and non-union employees received the same benefits and coverage terms for relevant insurance programs.

2.        *Duration of the 1998 CBA and the Grievance Procedure*

Under Article XIX of the 1998 CBA, the parties agreed that "[u]nless otherwise agreed upon by the parties, notice to modify and/or terminate within the time period specified above shall prevent this Agreement from renewing itself and shall automatically terminate said Agreement upon its expiration date without benefit of further notice of either party." (J.A. at 52)

Moreover, under Article XXI of the 1998 CBA, both the Company and the Union agreed that neither could make unilateral changes to the items referenced in the 1998 CBA.  (J.A. at 53)  In anticipation of grievances for alleged violations of the 1998 CBA, Article XVII both defined what a grievance meant under the CBA and authorized the use of arbitration to resolve grievances.  Specifically, Article XVII provided that

A grievance is any difference between the employer and an employee or employees or the Union about what any part of this Agreement means or how it will be applied.
***
In the event that no settlement is reached, either party, upon written notice to the other, may refer the matter to an impartial arbitrator whose decision shall be final and binding upon all parties to the grievance.  However, the arbitrator shall not have the

right to delete or make changes in any of the provisions of this Agreement, or to insert new ones . . . .

(J.A. at 50-51)

### B.        Change to the Umbrella of Benefits Plan

In November of 2001, the Company notified both Union and non-Union employees of changes to the Umbrella of Benefits plan for the upcoming year. The Company announced that the changes would result in increased costs for health insurance premiums and other out-of-pocket expenses. On November 5, 2001, the Union protested the increase, alleging that the changes to the Umbrella of Benefits plan were unilateral and therefore violative of the 1998 CBA. Notwithstanding the Union's protest, the Company proceeded to implement the changes on January 1, 2002.

### C.        2002-2007 Collective Bargaining Agreement

In February of 2002, the Union provided the Company with notice that it was seeking changes or amendments to the 1998 CBA. Under the terms of the 1998 CBA, the automatic termination clause of the Agreement is triggered when either party seeks to change or amend the existing Agreement. Thereafter, the Company and the Union engaged in negotiations for a new collective bargaining agreement. As a consequence of these negotiations, the parties reached agreement regarding a new five-year collective bargaining agreement which went into effect on April 27, 2002. The 2002 CBA incorporated identical language from Article XXI and Appendix C of the 1998 CBA.

### D.        Union Grievance and the Original Arbitration Award

On March 19, 2002, the Union filed a charge against the Company with the National Labor Relations Board, alleging that "on or about December, 2001, and continuing thereafter," the Company "failed and refused to bargain in good-faith" with the Union regarding changes to the Umbrella of Benefits plan. (J.A. at 283) In response, NLRB Region 9 determined that the Union's charge should be administratively deferred for arbitration in accordance with the terms of the 1998 CBA. According to the NLRB Regional Director, the Company "expressed a willingness for a reasonable period of time to arbitrate the dispute underlying the charge . . . notwithstanding . . . the subsequent expiration of the [1998] contract." (J.A. at 70)

On June 17, 2002, pursuant to the NLRB's deferral, the Union filed a grievance with the Company, again alleging that the changes to the Umbrella of Benefits plan violated the 1998 CBA. In the grievance, the Union sought to have pre-January 1, 2002 insurance premiums reinstated and employees reimbursed for the additional premiums paid as a result of the January 1, 2002 increases. The parties, however, were unable to settle the grievance and therefore submitted the matter for arbitration before a jointly-selected arbitrator.

Because the parties did not stipulate the issues to be decided by the Arbitrator, the Arbitrator determined the issues to be as follows:

Did Management violate the Agreement when they unilaterally made changes in the healthcare insurance benefits beginning on January 1, 2002?

If Management violated the Agreement, what is the appropriate remedy?

(J.A. at 80) The Arbitrator relied on the 1998 CBA to resolve the two above-referenced issues in favor of the Union.

With respect to the first issue, the Arbitrator examined Article XXI, the Waiver Clause of the 1998 CBA, to find that "the healthcare insurance benefits and the employees' share of the premiums in effect at the time the Agreement was finalized is what the Union bargained for with the Company and they are not subject to unilateral change by Management during the lifetime of the Agreement." (J.A. at 87)

On March 5, 2004, to remedy the violation of the 1998 CBA, the Arbitrator ordered that

> [t]he changes Management made to the employees' healthcare insurance coverage on or about January 1, 2002 are hereby rescinded and all of the benefits previously in effect are to be reinstated. The change in employees' share of the healthcare insurance premiums that occurred as a result of these changes are hereby rescinded and employees are to be reimbursed for any and all additional costs they incurred as a result of Management having violated the Agreement. In addition, employees are to be reimbursed for all monies spent for benefits that would have been paid for under the coverage in effect before the changes occurred, but were not paid for after the changes occurred. Management is hereby directed to cease and desist from unilaterally making any changes in employees' healthcare insurance benefits provided for in Appendix C of the Agreement. Management is hereby directed to cease and desist from unilaterally increasing employees' share of healthcare insurance premium costs. The Arbitrator will retain jurisdiction over this matter until the award is fully implemented.

(J.A. at 89)

### E.     Alleged Non-Compliance and Supplemental Award

In response to the Arbitrator's award in favor of the Union, the Company calculated the loss incurred by each employee as a result of the benefits change between January 1, 2002, the commencement of the health plan changes, and April 26, 2002, the expiration date of the 1998 CBA. The Company did not, however, revoke the January 1, 2002 change to the health benefits plan or reinstate the prior terms of the Umbrella of Benefits plan. Consequently, the Union filed a complaint with the Arbitrator arguing that the Company was not in compliance with his March 5, 2004 award.

Thereafter, the parties agreed to submit the non-compliance dispute to the Arbitrator through "supplemental proceedings" and a hearing was held on September 13, 2004. At the outset of the hearing, the Arbitrator noted that he did not retain the documents regarding his March 5, 2004 award. Therefore, the parties submitted joint exhibits containing the 1998 CBA, the NLRB referral to arbitration, and the initial grievance filed by the Union. During the supplemental proceedings, the parties presented oral arguments and later briefed controverted issues before the Arbitrator.

In arguments before the Arbitrator, the Union asserted that the Company failed to comply with the Arbitrator's March 5, 2004 award inasmuch as the Company failed to rescind the increase in insurance premiums and limited its employee reimbursement to the date on which the 1998 CBA expired. The Union contended that the Arbitrator's prior cease and desist order extended beyond the expiration of the 1998 CBA and required the Company to make employees whole for the entire period that the increased insurance premiums were in effect, not simply for the period of the 1998 CBA. The 2002 CBA, the Union contended, had no bearing on the Company's duty to extend its compliance with the order beyond the expiration of the 1998 CBA. In particular, the Union argued that "[g]iven the specific cease and desist language of the March 5, 2004 Award, the effective date of the new CBA is of no significance since [the language of] Appendix C [] did not change from the 1998-2001 CBA which was in effect when the grievance was filed." (J.A. at 149-50)

The Company, however, argued that the Arbitrator's award was effective only during the life of the 1998 CBA. In particular, the Company argued that the parties agreed to arbitrate the grievance as governed by the 1998 CBA and that all of the evidence presented to the Arbitrator related to the 1998 CBA. Further, the Company noted that the Arbitrator heard no evidence regarding the 2002 CBA or the negotiations leading up to the agreement. The Company argued that "a determination of what health care benefits employees are entitled [to] at any point in time during the term of the new labor agreement – that is, after April 26, 2002, can only be determined by an interpretation and application of the terms of that agreement." (J.A. at 137) To the extent that the Union complained about health benefit premiums after April 26, 2002, the Company asserted, the Union must file a separate grievance under the 2002 CBA.

After hearing arguments from both the Union and the Company, the Arbitrator requested a copy of the 2002 CBA, noting that "[i]t may or may not have any relevancy to the disposition of this particular matter." (J.A. at 114) The Company complied with the Arbitrator's request. Counsel for the Company, however, made clear that "I'll note for the record that I would not submit that as evidence pertinent to this matter but simply as a convenience to the arbitrator." (*Id.*) Neither party offered any additional evidence regarding the 2002 CBA or the negotiations that led to its execution.

On September 30, 2004, the Arbitrator issued a decision and award regarding the Company's compliance with his March 5, 2004 award. The parties did not stipulate to the issues to be decided by the Arbitrator. Therefore, the Arbitrator determined the issues to be as follows:

Has Management complied with the Arbitrator's March 5, 2004 Award?

If not, what is the appropriate remedy?

(J.A. at 171-72)

The Arbitrator found that the Company was not in compliance with his March 5, 2004 award. The Arbitrator noted that "the decisions Management put into effect on or about January 1, 2002 have remained in effect to date. The healthcare insurance benefits that employee[s] had prior to January 1, 2002 have been diminished while co-pays have increased." (J.A. at 171)

The Arbitrator further found that

At the September 4, 2003 and February 12, 2004 Hearings the Arbitrator was well aware of the fact that a successor agreement (2002-2007) was in effect. The Arbitrator also recognized [] Management's belief that they have the unfettered authority to change negotiated copays for employees' healthcare insurance benefits and the kinds and levels of benefits themselves have carried over intact from the 1998-2001 agreement to the 2002-2007 agreement.

When the Arbitrator rendered his decision and fashioned the Award it was with the clear intention of providing quasi-injunctive relief and it is for this reason that he issued a cease and desist order as part of the Award. The NLRB and the Courts have long recognized that arbitrators have the legitimate authority to grant quasi-injunctive relief in the form of cease and desist orders.

The Arbitrator notes that nothing in the 2002-2007 agreement gives Management the right to unilaterally change negotiated healthcare insurance benefits or negotiated copays. Clearly, if Management's decision was violative of the 1998-2001 agreement it is violative of the 2002-2007 agreement. The improper action that occurred during the 1998-2001 agreement simply carried over into the 2002-2007 agreement.

(J.A. at 172)  To remedy the Company's non-compliance, the Arbitrator directed the Company to "comply with the provisions of the March 5, 2004 Award," and retained jurisdiction over the award until fully implemented.  (*Id.*)

The Company later filed a complaint with the United States District Court for the Southern District of Ohio requesting that the Arbitrator's supplemental award be set aside and vacated.  The Company's complaint alleged that the Arbitrator acted outside of his authority by "interpreting" the 2002 CBA in his supplemental award in favor of the Union.  The Union counterclaimed for enforcement of both the supplemental award as well as the Arbitrator's original March 5, 2004 award.  The parties filed cross-motions for summary judgment.  The district court confirmed the original March 5, 2004 award but vacated the Arbitrator's supplemental award, and remanded the compliance issue to the Arbitrator for further proceedings.  The Union now timely appeals.

## DISCUSSION

### Arbitrator's Authority to Issue the Supplemental Award in Favor of the Union

#### A.        Standard of Review

This Court reviews a district court's grant of summary judgment in a labor arbitration dispute *de novo*. *Way Bakery v. Truckdrivers, Local No. 164*, 363 F.3d 590, 593 (6th Cir. 2004).  Summary judgment is appropriate if the evidence, when viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue of material fact such that the moving party is entitled to judgment as a matter of law. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  "The judge is not to weigh the evidence and determine the truth of the matter, but rather determine whether there is a genuine issue for trial." *Sterling China Co. v. Glass, Molders, Pottery, Plastics and Allied Workers Local No. 24*, 357 F.3d 546, 551 (6th Cir. 2004).

Although we review a district court's summary judgment disposition *de novo*, in the context of arbitration, "courts play only a limited role when asked to review the decision of an arbitrator." *Tennessee Valley Auth. v. Tennessee Valley Trades & Labor Council*, 184 F.3d 510, 514 (6th Cir.1999) (per curiam) (quotation marks and citation omitted).  Indeed, "[a] court's review of an arbitration award 'is one of the narrowest standards of judicial review in all of American jurisprudence.'" *Way Bakery*, 363 F.3d at 593 (quoting *Tennessee Valley Auth.*, 184 F.3d at 515).

It is well-established that an arbitrator's award is legitimate and must be upheld where it is drawn from the collective bargaining agreement and the issues submitted for determination by the parties. *United Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 597 (1960).  So long as "an arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, the fact that a court is convinced he committed serious error does not suffice to overturn his decision." *Major League Baseball Players Assoc. v. Garvey*, 532 U.S. 504, 509 (2001) (internal quotations and citations omitted).  Indeed, "[b]ecause the parties have contracted to have disputes settled by an arbitrator chosen by them rather than by a judge, it is the arbitrator's view of the facts and of the meaning of the contract that they have agreed to accept." *United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc.*, 484 U.S. 29, 37-38 (1987).  Consequently, "courts are not authorized to reconsider the merits of an award even though the parties may allege that the award rests on errors of fact or on misinterpretation of the contract." *Id.* at 36.

Indeed, "[t]he refusal of courts to review the merits of an arbitration award is the proper approach to arbitration under collective bargaining agreements. The federal policy of settling labor disputes by arbitration would be undermined if courts had the final say on the merits of the awards." *Enterprise Wheel & Car Corp.*, 363 U.S. at 596.  However, an arbitrator's award "must draw its essence from the contract and cannot simply reflect the arbitrator's own notions of industrial justice." *Misco*, 484 U.S. at 38.  "When the arbitrator's words manifest an infidelity to this

obligation," the scope of the arbitrator's authority has been exceeded and "courts have no choice but to refuse enforcement of the award." *Enterprise Wheel & Car Corp.*, 363 U.S. at 597.

In *Michigan Family Resources, Inc. v. Service Employees International Union Local 517M*, 475 F3d 746 (2007) (en banc), this Court further narrowed the scope of judicial review regarding labor-arbitration disputes. Taking guidance from the Supreme Court's decisions in *Misco* and *Garvey*, this Court overruled its prior four-part test under *Cement Divisions, Nat'l Gypsum Co. v. United Steelworkers of America*, 793 F.2d 759 (6th Cir. 1986),[1] and announced a new line of inquiry regarding arbitration awards. *Id.* at 753.

In *Michigan Family Resources*, this Court held that arbitration awards should be reversed on appeal only where a "procedural aberration" occurs within the arbitration process. *Id.* To determine whether a procedural aberration has occurred, this Court must ask:

> Did the arbitrator act 'outside his authority' by resolving a dispute not committed to arbitration? Did the arbitrator commit fraud, have a conflict of interest or otherwise act dishonestly in issuing the award? And in resolving any legal or factual disputes in the case, was the arbitrator 'arguably construing or applying the contract'?

*Id.* If the response to these questions is negative, "the request for judicial intervention should be resisted even though the arbitrator made 'serious,' 'improvident' or 'silly' errors in resolving the merits of the dispute." *Id.* Moreover, "[t]he arbitrator does not exceed his authority every time he makes an interpretive error; he exceeds that authority only when the collective bargaining agreement does not commit the dispute to arbitration." *Id.* at 756.

Although this Court should be loath to vacate an award in a labor arbitration dispute, there are occasions in which judicial intervention may be warranted. Indeed, as we noted in *Michigan Family Resources*, "we cannot ignore the specter that an arbitration decision could be so ignorant of the contract's plain language as to make implausible any contention that the arbitrator was construing the contract." *Id.* at 753 (internal quotations and citations omitted). Nevertheless, such intervention should be the exception and not the rule, "[f]or in most cases, it will suffice to enforce the award that the arbitrator appeared to be engaged in interpretation, and if there is doubt we will presume that the arbitrator was doing just that." *Id.*

With these thoughts in mind, we now address the claims of the Union.

## B.     Analysis

The Union argues that the district court misapplied *Michigan Family Resources* when it vacated the Arbitrator's award based on findings that (1) the Arbitrator was not arguably construing "the contract;" and (2) he acted outside of his authority by resolving a dispute not committed to arbitration. We will address each point of contention.

---

[1]The previous test utilized to evaluate arbitration awards, as announced in *Cement Divisions*, allowed for vacatur of an award where the award failed to draw its essence from the collective bargaining agreement. Under *Cement Divisions*, to determine whether an award drew its essence from the agreement, we considered whether "(1) the award conflicts with express terms of the collective bargaining agreement; (2) an award impos[ed] additional requirements that are not expressly provided in the agreement; (3) an award is without rational support or cannot be rationally derived from the terms of the agreement; and (4) an award is based on general considerations of fairness and equality instead of the precise terms of the agreement." 793 F.2d at 766 (internal citations omitted).

1.       *Arguably Construing the Contract*

The Union contends that the Arbitrator "arguably construed" the collective bargaining agreement when he issued the supplemental award in favor of the Union, albeit through a more circuitous route. The Union asserts that the "contract" that the Arbitrator was construing was the original award inasmuch as the parties placed the issue of compliance with that award squarely before the Arbitrator for determination. The Union contends that the original award was to have life after the expiration of the 1998 CBA and that both parties granted the Arbitrator authority to determine whether the Company was in compliance with the original award. The Company, however, asserts that the Arbitrator was not construing, arguably or otherwise, any portion of the 1998 CBA when he made reference to the 2002 CBA and that the original award does not constitute a "contract" that the Arbitrator could construe to reach the 2002 CBA.

In *Michigan Family Resources*, this Court explained that an arbitration award must be upheld if the arbitrator was "arguably construing" the relevant contractual provisions. 475 F.3d at 753. We find that an arbitrator may "arguably construe a contract" in a supplemental proceeding which clarifies or enforces an original award that has as its basis the relevant collective bargaining agreement. *See Sterling China Co.*, 357 F.3d at 557.

In *Sterling China Company v. Glass, Molders, Pottery, Plastics & Allied Workers Local 24*, 357 F.3d 546 (6th Cir. 2004), this Court held that a supplemental award arguably construed a collective bargaining agreement where it "drew its essence" from an original award that interpreted the collective bargaining agreement. There, the plaintiff, Sterling China Company, appealed from a district court order enforcing a supplemental arbitration award in favor of the union. *Id.* at 548. The plaintiff argued that the arbitrator's supplemental award should be vacated inasmuch as the award did not construe the collective bargaining agreement that served as the basis for the underlying dispute. *Id.* at 556. This Court, however, disagreed. The *Sterling China* court noted that the underlying dispute regarding wages for particular job classifications was governed by the collective bargaining agreement and that the arbitrator, in making his original award, interpreted and construed that agreement to conclude that the union's grievance should be sustained. *Id.* Therefore, even under the more lenient *Cement Divisions* test, this Court held that "whether the arbitrator correctly determined the award or not, the district court's ruling may not be reversed on review since the supplemental award ultimately drew its essence from the CBA." *Id.* at 557. *See also Int'l Ass'n of Machinists and Aerospace Workers v. Tennessee Valley Authority*, 155 F.3d 767 (6th Cir. 1998) (finding that a supplemental arbitration award arguably construed a collective bargaining agreement because it relied upon an original award that determined the parties' rights under the relevant agreement).

Similarly, in *Marcucilli v. American Airlines*, No. 04-40244, 2007 WL 1219042 (E.D. Mich. 2007), the court held that two supplemental arbitration awards "arguably construed" a collective bargaining agreement because both were based upon an original award that "construed the CBA." *Id.* at *2.

Taken together, *Sterling China*, *International Association of Machinists* and *Marcucilli* stand for the proposition that a supplemental award "arguably construes" a collective bargaining agreement where the supplemental award seeks to clarify or enforce an original award that interpreted the relevant agreement. Thus, whether the "contract" at issue was the 1998 CBA or the Arbitrator's original award is insignificant inasmuch as both reference the same document: the 1998 CBA that produced the initial grievance.

The Union, however, argues that the parties' "submission" to the Arbitrator constituted an agreement that broadened the scope of what the Arbitrator was to "arguably construe." The Union argues, without any support from this Circuit, that the Arbitrator was to construe not only the 1998

CBA but also the National Labor Relations Act ("NLRA"). The Union asserts that because the initial charge filed by the Union before the National Labor Relations Board included allegations that the Company engaged in unfair labor practices in violation of the NLRA, when the charge was administratively deferred, "the entire Charge arguably went to the Arbitrator for resolution." (Union Br. at 30) Assuming that the Arbitrator was construing not only the 1998 CBA but also the NLRA, the Union argues that "[t]he Arbitrator's earlier construction of the 1998 CBA, and implicitly, Section 8(a)(5) of the NLRA is no longer challengeable. As such the Award is now the law-of-this-case whether or not it could have been successfully raised earlier." (Union Br. at 30).

Even assuming, *arguendo*, that the submission was broader than the 1998 CBA, the Arbitrator's original award undermines the Union's argument regarding what the Arbitrator actually or even arguably construed. When describing the nature of the case, the Arbitrator noted that "this case pertains to a dispute regarding the interpretation and application of language in *the Agreement*." (J.A. at 77) (emphasis added). The Arbitrator went on to summarize the parties' positions with respect to the Agreement as well as to provide a summary of the 1998 CBA itself, including the grievance provision and Appendix C. (J.A. at 78-79) Indeed, the Arbitrator framed the issues before him as "[d]id management violate the agreement when they unilaterally made changes in the healthcare insurance benefits beginning on January 1, 2002? If Management violated the Agreement what is the appropriate remedy?" (J.A. at 85, 89) The controlling document before the arbitrator, therefore, whether phrased as the original award or the 1998 CBA, ultimately stemmed from the 1998 CBA that was in force at the time the change to the healthcare benefits became effective.

Resolving the question of what the Arbitrator was to construe does not, however, resolve the critical question of whether the Arbitrator acted outside of his authority with respect to the supplemental award.

### 2.     *Authority to Render the Supplemental Award*

The Union argues that the district court erred when it found that the Arbitrator acted outside of his authority by reaching a dispute not committed to arbitration, i.e., whether the unilateral healthcare benefits increase was violative of the 2002 CBA. We disagree.

Prior to reaching the question of whether the Arbitrator acted outside of his authority, thus constituting a "procedural aberration" that warrants judicial intervention, we should note what is not at issue in this appeal. The issue before this Court is not whether the Arbitrator could order *quasi*-injunctive relief, or even whether he could order such relief after the expiration of the 1998 CBA. *See Bixby Medical Center, Inc. v. Michigan Nurses Ass'n*, 142 F. App'x 843, 850 (6th Cir. 2005) (unpublished) (affirming cease and desist arbitration order entered after the expiration of a collective bargaining agreement). The Arbitrator did so in the original award which was confirmed by the district court and is not challenged on appeal. Rather, the question before this Court under the "procedural aberration" review announced by *Michigan Family Resources* is whether the Arbitrator had authority to interpret the 2002 CBA in enforcing the original award during the supplemental compliance proceedings.

At the outset, we note that "in *Michigan Family Resources* we severely curtailed the 'scope of authority' concept. In that case, we stated: 'An arbitrator does not exceed his authority every time he makes an interpretive error; he exceeds his authority *only* when the collective bargaining agreement does not commit the dispute to resolution.'" *Truck Drivers Local No. 164 v. Allied Waste Sys.*, 512 F.3d 211, 217 (6th Cir. 2008) (quoting *Michigan Family Res.*, 475 F.3d at 756). When an arbitrator reaches a question not committed to him by the parties, he acts outside of his authority such that an order vacating such an award is appropriate. *See Peterbilt Motors Company v. UAW Int'l Union*, 219 F. App'x 434, 438 (6th Cir. 2007) (unpublished); *Int'l Brotherhood of Elec. Workers v. Toshiba America*, 879 F.2d 208, 211 (6th Cir. 1989).

For example, in *International Brotherhood of Electrical Workers v. Toshiba America*, 879 F.2d 208 (6th Cir. 1989), this Court considered a challenge to an arbitrator's award that ordered the defendant-company to reinstate five employees who were allegedly terminated in violation of a collective bargaining agreement. *Id.* at 208-09. There, employees who were members of a union under a collective bargaining agreement staged a job walkout in violation of the no-strike clause of the agreement. *Id.* at 209. The agreement also provided that any disciplinary action taken as a result of a violation of the no-strike clause "shall not be altered or amended in the grievance and arbitration procedures . . . ." *Id.* at 210. Following the walkout, the company terminated the employees and the union filed a grievance on their behalf. Because the parties were unable to resolve the grievance, the matter was submitted to arbitration. *Id.* at 209. Although the arbitrator found that the company had the right to terminate the employees because of their participation in the walkout, the arbitrator nonetheless ordered the employees reinstated. The arbitrator ordered the employees reinstated because of an oral agreement made between the company and the union that none of the employees who walked out would be terminated. *Id.* Relying on *Misco*, this Court vacated the arbitrator's award reinstating the employees. *Id.* at 210. We found that the arbitrator acted outside of his authority by reaching the question of the discipline imposed by the company once it had been determined that a violation of the no-strike clause occurred. *Id.* In other words, we found that the arbitrator exceeded his authority by reaching a question that was not properly presented to him for review under the relevant collective bargaining agreement.

Similarly, in *Peterbilt Motors Co. v. UAW International Union*, 219 F. App'x 434 (6th Cir. 2007), albeit in an unpublished opinion, this Court vacated an arbitrator's award upon finding that the arbitrator acted outside of his authority to reach a question that was not arbitrable under the collective bargaining agreement. There, a company and a union went to arbitration regarding an employee's accident and insurance benefits which were denied by a separate insurer. *Id.* at 435. Over the company's protest that the matter was not arbitrable because the insurer was not a party to the agreement, the arbitrator ruled that the company was required to pay for accident benefits under the agreement, notwithstanding the fact that the insurer denied coverage. *Id.* at 437. Therefore, the arbitrator concluded, the grievance regarding the insurance benefits was arbitrable as against the company. Relying on *Michigan Family Resources*, this Court vacated the award after concluding that the arbitrator reached a question not committed to him by arbitration because the arbitrator's award was "ignorant of the contract's plain language." *Id.* at 438.

In the instant case, the supplemental award issued by the Arbitrator which interpreted the 2002 CBA constituted a "procedural aberration" under *Michigan Family Resources*. It is undisputed that the parties did not submit a grievance for resolution under the 2002 CBA. Thus, similar to *Toshiba* and *Peterbilt*, the Arbitrator reached a question not submitted to him by the parties when he opined that "if Management's decision was violative of the 1998-2001 agreement it is violative of the 2002-2007 agreement." Consequently, in reaching the question of the violation of the 2002 CBA, the Arbitrator acted outside of his authority; and therefore, the supplemental award was properly vacated even under the narrow standard announced by *Michigan Family Resources*.

Indeed, at the initiation of the arbitration process, the central questions presented to the Arbitrator were whether the Company violated the 1998 CBA and if so, what measures would appropriately remedy the violation. When the parties returned to the Arbitrator for compliance proceedings the question addressed to the Arbitrator shifted somewhat. The question of liability under the 1998 CBA had been resolved inasmuch as the Arbitrator's original award found that the Company had violated the 1998 CBA. In addition, the Company's non-compliance with the original award was unquestioned because the health care premiums had not been rescinded, nor had employees been reimbursed for the cost of the increase. Rather, the central dispute at the compliance proceeding came down to whether the Arbitrator's orders were coterminous with the 1998 CBA or whether they were to have effect after its expiration. Clearly, while the issues in dispute varied between the original proceeding and the compliance proceeding, the basic question

submitted to the Arbitrator remained the same: the Company's required duties under the 1998 CBA. Thus, when the Arbitrator addressed the question of the 2002 CBA, he acted outside of his authority by reaching a question not presented to him by the parties.[2]

The Union, however, argues that the Arbitrator properly considered the 2002 CBA, not for the purpose of determining whether a violation of that agreement occurred, but for the purpose of determining whether the Company was obliged to comply with his previous order after the expiration of the 1998 CBA. The Union argues that the Arbitrator's reference to the 2002 CBA was not an attempt to interpret the agreement, but rather, an attempt to evaluate the veracity of the Company's "intervening-event defense." The Union argues that the Arbitrator was considering whether the parties to the 2002 CBA may have taken intervening action that undermined, made unnecessary, or "mooted out" the rescission, reinstatement, and cease and desist orders issued in the original award. Absent this "intervening event" defense, argues the Union, the 2002 CBA would not have been relevant to the compliance determination at all. The Union asserts that "[i]n making reference to the successor CBA, the Arbitrator was not doing anything significantly different from, or more than, what the NLRB would do in a compliance proceeding, which is analogous to what the Arbitrator was doing in the Supplemental Award proceedings." (Union Br. at 41)

In support of this proposition, the Union cites a case from the National Labor Relations Board, *Lawrenceville Ready-Mix*, 305 NLRB 1010 (1991). In *Lawrenceville Ready-Mix*, the NLRB considered a charge by a union alleging that an employer engaged in an unfair labor practice by refusing to bargain collectively with the representatives of his employees regarding an increase to healthcare costs in violation of § 8(a)(5) of the NLRA. *Id.* at 1012-13. A judge considered the charge and found in favor of the union, ordering a number of remedies including reimbursements to employees for the increased healthcare costs. *Id.* The employer later challenged the order, alleging that the order was "no longer appropriate because the parties have entered into a new collective bargaining agreement." *Id.* at 1010. In consideration of the employer's allegation, a panel of the NLRB permitted the introduction of evidence at the compliance stage regarding the new agreement to determine if the new agreement cut off the employer's obligations under the prior order. *Id.* at 1011. The Union asserts that, like the NLRB in *Lawrenceville Ready-Mix*, the Arbitrator's consideration of the 2002 CBA was relevant to whether the new agreement cut off the Company's responsibility to implement the original award beyond the expiration of the 1998 CBA, as was alleged by the Company.

The Union's argument seems logical enough. Here, the Arbitrator issued an order for the Company to reimburse its employees for the increased health care costs and to cease and desist from further unilateral action. The Company responded that it only had to cease and desist and reimburse employees for the four months between the increase in healthcare costs and the expiration of the 1998 CBA. Thus, it would seem that the 2002 CBA would be relevant in determining whether it properly cut off obligations on the part of the Company. Despite the logic of this argument, it still does not resolve the question of the Arbitrator's authority to *construe* the 2002 CBA. Because this question remains unanswered, the analysis offered in *Lawrenceville Ready-Mix* is inapposite. First, the Union cites no binding authority suggesting that an arbitrator has powers that are coextensive with the NLRB such that statutory violations can be resolved in arbitration. Second, even assuming

---

[2]Indeed, were we to uphold the Arbitrator's supplemental decision, as the dissent would urge us to do, we would likely undermine the parties' freely negotiated, bargained-for procedures which require the submission of a grievance prior to the determination of remedies. This end-run around the collective bargaining agreement would, therefore, produce a windfall to the Union by opening up an opportunity for the Union to seek sanctions against the Company for the violations of the 2002 CBA as found by the Arbitrator. The Company, on the other hand, would be stuck with a decision, rendered in the absence of a full hearing, finding that it violated the 2002 CBA. In the end, both the Union and the Company would have been subjected to remedies and obligations under the 2002 CBA that they did not arbitrate. For this reason alone, we must vacate the Arbitrator's supplemental award.

that the Arbitrator had powers analogous to those of the NLRB, *Lawrenceville Ready-Mix* does not suggest that the Arbitrator would have had authority to determine that a violation of a new agreement occurred absent a separate charge or grievance being filed under that agreement.

The Union, however, asserts that the Arbitrator had authority to construe the 2002 CBA based on "the Recognition Clause, as well as the deferred Charge, to determine whether the Company had met its contractual and statutory bargaining obligations." (Union Reply Br. at 14) The Recognition Clause of the 1998 CBA provided that the Company recognized the Union "for the purpose[] of collective bargaining with regard to . . . working conditions and all other terms and conditions of employment . . . ." The Union argues that "[s]uch contractual clauses have been interpreted as, effectively, incorporating an employer's statutory obligation to bargain in good faith with a union, including its obligation not to make unilateral changes." (*Id.*)

The Union cites two cases from other circuits which approved of arbitration awards where the arbitrators found that employers' statutory duties to bargain in good faith were incorporated into a contractual recognition clause, even where such duties are not explicitly referenced in an agreement. *See Five Star Parking v. Union Local 723*, 2007 WL 2110716, at *5 (3d Cir. 2007) (unpublished); *Virginia Mason Hosp. v. Washington State Nurses Ass'n*, 511 F.3d 908, 914 (9th Cir. 2007). We need not resolve whether the recognition clause incorporated the Company's statutory duty, however, because the cases relied upon by the Union are inapposite. First, in *Five Star* and *Virginia Mason Hospital*, the arbitrators that found violations of the contractual recognition clauses were interpreting the terms of the collective bargaining agreements actually committed to them by the parties and heard testimony regarding the negotiations that went into crafting the agreements. In the instant case, the Arbitrator was not referencing an agreement that was actually put before him when he found that the 2002 agreement was violated by the healthcare changes. Second, and most important, in each of the cases the arbitrators explicitly based their decisions in favor of the unions on the contractual recognition clauses of each agreement at issue. Here, the Arbitrator did not rest his decision on the contractual recognition clause, and we are not at liberty to delve into the merits of the arbitration dispute to find an alternative rationale that would allow the award to be affirmed. This is not a typical appeal where this Court may affirm for any reason supported by the record, even if the opinion below did not rely on such grounds. To do so would be to impermissibly replace the judgment of this Court for that of the arbitrator. Indeed, this Court has "no business weighing the merits of the grievance, considering whether there is equity in a particular claim, or determining whether there is particular language in the written instrument which will support the claim." *Michigan Family Res.*, 475 F.3d at 750 (quoting *Enterprise Wheel & Car Corp.*, 363 U.S. at 568).

In the alternative, the Union argues that under *Michigan Family Resources*, this Court must presume that an arbitrator is acting within his authority to construe an agreement that is properly before him. Thus, the Union argues that the district court should have viewed the Arbitrator's reference to the 2002 CBA as dicta and affirmed the award on the permissible rationale discussed in the supplemental award. In other words, the Union asserts, "the district court failed to interpret and apply this supplemental 'contract' as it should have to make it enforceable, if possible, rather than striking it down." (Union Br. at 34). We do not, however, read *Michigan Family Resources* as suggesting that courts reviewing arbitration awards must overlook instances "[w]hen the arbitrator's words manifest an infidelity" to address questions committed to him by the parties. *Enterprise Wheel & Car Corp.*, 363 U.S. at 596. Certainly, reversals of arbitration awards should be few and far between and reserved for only the most "egregious" of errors. In the instant case, the Arbitrator's supplemental award constitutes such an occasion because the Arbitrator did not confine himself "to interpretation and application of the collective bargaining agreement" put before him by the parties. *Id.* at 597. Inasmuch as the Arbitrator went outside of his authority by interpreting the 2002 CBA, thus entering "the forbidden world of 'effectively dispens[ing] his own brand of industrial justice,'" we must uphold the district court's order vacating and remanding the supplemental award. *Michigan Family Res.*, 475 F.3d at 752 (quoting *Garvey*, 532 U.S. at 509).

**CONCLUSION**

For the reasons stated above, we **AFFIRM** the judgment of the district court.

———————————

**DISSENT**

———————————

McKEAGUE, Circuit Judge, dissenting. The district court determined that this matter should be returned to the Arbitrator because, in that court's words, "The Arbitrator . . . undertook to determine whether the Company had complied with the 2002-2007 CBA." *totes>>Isotoner Corp. v. Int'l Chem. Workers Union Council*, No. 1:04-CV-849, 2007 WL 1108462, at *5 (S.D. Ohio Apr. 10, 2007) (unpublished). That conclusion depends critically on whether the Arbitrator had the authority to direct prospective relief beyond the expiration date of the 1998 CBA (i.e., April 26, 2002). If he had such authority, or if that question is not before us because it has been waived, then the Arbitrator's references to the 2002 CBA can be viewed as part of the Arbitrator's finding that the Company had not complied with the ordered remedy in the Original Award, rather than a determination that the Company had violated the 2002 CBA.

**I**

Considering the latter issue first, the Arbitrator awarded prospective "quasi-injunctive" relief in addition to retrospective monetary relief in the Original Award : "Management is hereby directed to cease and desist from unilaterally making any changes in employees' healthcare insurance benefits provided for in Appendix C of the Agreement. Management is hereby directed to cease and desist from unilaterally increasing employees' share of healthcare insurance premium costs." Original Award at 13. When asked whether the Company had complied with the Original Award, the Arbitrator explained in relevant part in his Supplemental Award:

> The Arbitrator notes that nothing in the 2002-2007 agreement gives Management the right to unilaterally change negotiated healthcare insurance benefits or negotiated copays. Clearly, if Management's decision was violative of the 1998-2001 agreement it is violative of the 2002-2007 agreement. The improper action that occurred during the 1998-2001 agreement simply carried over into the 2002-2007 agreement.

Supplemental Award at 4.

This paragraph is at the heart of the dispute. Certainly, it can be read as the district court and majority suggest: the Arbitrator exceeded his authority under the 1998 CBA by determining whether the Company had complied with the 2002 CBA. However, assuming for the moment that the Arbitrator had the authority to order prospective relief beyond the expiration of the 1998 CBA, the paragraph can be viewed in a different light.

As explained above, the Arbitrator had directed the Company to cease and desist from unilaterally increasing employees' share of healthcare insurance premium costs. This directive was reasonably intended to apply beyond the expiration of the 1998 CBA. To determine whether his directive had been complied with, the Arbitrator would have had to look at evidence outside the 1998 CBA. When considering the 2002 CBA, the Arbitrator first explained that the new agreement had not mooted his prospective relief ("nothing in the 2002-2007 agreement gives Management the right to unilaterally change negotiated healthcare insurance benefits or negotiated copays"), nor satisfied it ("Clearly, if Management's decision was violative of the 1998-2001 agreement it is violative of the 2002-2007 agreement. The improper action that occurred during the 1998-2001 agreement simply carried over into the 2002-2007 agreement."). In other words, the Arbitrator

looked at the 2002 CBA and saw the status quo, and the status quo violated the prospective relief he ordered in the Original Award.

Under this construction of the Supplemental Award, the Arbitrator was "arguably . . . applying . . . and acting within the scope of his authority" under the Original Award. *Mich. Family Res., Inc. v. Serv. Employees Int'l Union Local 517M*, 475 F.3d 746, 752 (6th Cir.) (citation omitted), *cert. denied*, 127 S. Ct. 2996 (2007). The Arbitrator was not, according to this construction, determining whether the 2002 CBA had been violated by the Company. Rather, the 2002 CBA was one piece of evidence that the Arbitrator consulted to determine whether the Company had complied with his earlier cease and desist directive. Because the 2002 CBA had the exact same provisions as the 1998 CBA, and because the Company admittedly had not extended relief beyond the expiration date of the 1998 CBA, the Arbitrator concluded that the Company continued to violate the cease and desist directive.

Whether this is the most natural way to read the Supplemental Award does not control, as long as it is a plausible reading. We must resolve any reasonable doubt about whether an award draws its essence from the contract in favor of enforcing the award. *United Steelworkers of Am. v. Enter. Wheel & Car Corp.*, 363 U.S. 593, 598 (1960) ("A mere ambiguity in the opinion accompanying the award, which permits the inference that the arbitrator may have exceeded his authority, is not a reason for refusing to enforce the award."); *Polk Bros., Inc. v. Chicago Truck Drivers, Helpers & Warehouse Workers Union (Independent)*, 973 F.2d 593, 597 (7th Cir. 1992). Because the Supplemental Award can plausibly be read as concluding not that the Company violated the 2002 CBA, but rather failed to satisfy the prospective remedy in the Original Award, we should defer to the Arbitrator under the highly deferential standard of review applied to arbitration awards. *Mich. Family*, 475 F.3d at 753 ("[O]nce it was established that the arbitrator was construing or applying the contract (and acting within the scope of his authority), it made no difference whether the arbitrator had committed serious, improvident or even silly errors in resolving the merits of the dispute." (internal quotation marks omitted)).

The crucial question becomes, then, whether the Arbitrator had the authority to order prospective relief beyond the expiration of the 1998 CBA.

## II

This question presents a close call. I agree with the majority that the Union misses the mark with several of its arguments. For example, the Union asserts that the Arbitrator was standing in the shoes of the NLRB and therefore had the authority to remedy violations of the workers' statutory rights. Alternatively, the "Recognition" section of the 1998 CBA incorporated statutory rights into the agreement, according to the Union. Yet, while an arbitrator's award can, under certain limited circumstances, remedy statutory violations,[1] there is nothing to suggest that this Arbitrator was construing anything but contractual rights and duties. The parties' briefs to the Arbitrator focus on the 1998 CBA provisions, and both the Original and Supplemental Awards deal with the contractual rights and duties of the parties. It is also difficult to read the "Recognition" section as incorporating all of the statutory rights under the National Labor Relations Act of 1947 (the "NLRA") into the

---

[1] *See, e.g.*, *Five Star Parking v. Union Local 723*, 246 F. App'x 135, 139 (3d Cir. 2007) (unpublished) ("While it is true that, for purposes of efficiency and economy, an arbitrator may at times hear issues pertaining to unfair labor practices, this is only permissible when the arbitrator decides NLRA issues in addition to issues of contract interpretation."), *cert. denied*, 128 S. Ct. 1229 (2008).

CBA. In any event, the Arbitrator did not discuss or otherwise signal any reliance on any specific provision of the NLRA.[2]

The best argument of the Union is that the Company has waived the issue. Neither party sought to vacate, modify, or correct the Original Award in state or federal court. The deadline for doing so has since passed. O.R.C. § 2711.13 (requiring that notice of a motion to vacate, modify, or correct an arbitration award must be served within three months after the award is delivered to the parties). Moreover, the parties did not seek "clarification" of the Original Award (a request that is not subject to the three-month deadline, *see Sterling China Co. v. Glass, Molders, Pottery, Plastics & Allied Workers Local No. 24*, 357 F.3d 546, 552-53 (6th Cir. 2004)). In fact, the Company asserts in its amended complaint that the Original Award "was not ambiguous"—instead, according to the Company, the supplemental proceeding was necessary solely to resolve whether the award had been satisfied. Amended Complaint ¶23.

In its brief on appeal, the Company convincingly argues that the Arbitrator's authority could not be expanded to include an issue which the Company clearly indicated it did not intend to arbitrate—i.e., whether its unilateral actions violated the 2002 CBA. Yet, by not seeking a modification or clarification of the Original Award and by asserting in its complaint that the Original Award is unambiguous, the Company has, by its actions, agreed to be bound by the Original Award. Accordingly, we should treat the Original Award "as if it represented an agreement between [the company] and the union as to" the proper remedy for the Company's violation of the 1998 CBA. *E. Associated Coal Corp. v. United Mine Workers of Am., Dist. 17*, 531 U.S. 57, 62 (2000). In other words, "[f]or present purposes, the award is not distinguishable from the contractual agreement." *Id.* This is key—the question before us becomes, in effect, whether the Supplemental Award draws its essence from the 1998 CBA *or* the Original Award.[3]

*Enterprise Wheel* emphasized a crucial point with respect to remedies—"an arbitrator needs flexibility when formulating remedies." *Dexter Axle Co. v. Int'l Ass'n of Machinists & Aerospace Workers, Dist. 90, Lodge 1315*, 418 F.3d 762, 768-69 (7th Cir. 2005) (citing *Enterprise Wheel*, 363 U.S. at 597) (footnote omitted). "[W]here it is contemplated that the arbitrator will determine remedies for contract violations that he finds, courts have no authority to disagree with his honest judgment in that respect." *United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 38 (1987). "A court 'must consider whether it is at all plausible to suppose that the remedy [the arbitrator] devised was within the contemplation of the parties and hence implicitly authorized by the agreement.'" *Dexter Axle*, 418 F.3d at 769 (quoting *Local 879, Allied Indus. Workers of Am. v. Chrysler Marine Corp.*, 819 F.2d 786, 789 (7th Cir. 1987)).

The Arbitrator concluded in the Supplemental Award that the Company failed to comply with the Original Award because the Company had not altered its unilateral action over health insurance. If, as the Company argues, the Original Award, including its remedial provisions, extends no farther in time than the 1998 CBA, then clearly the Arbitrator acted outside his authority

---

[2] For example, an employer violates its bargaining obligations under Sections 8(a)(1) and (5) of the NLRA if it changes a term or condition of employment without bargaining with the employees' bargaining representative. *Litton Fin. Printing Div. v. NLRB*, 501 U.S. 190, 198 (1991) (citing *NLRB v. Katz*, 369 U.S. 736, 743 (1962)); *NLRB v. Plainville Ready Mix Concrete Co.*, 44 F.3d 1320, 1325-26 (6th Cir. 1995).

[3] The Company misreads *Eastern Associated Coal* to hold that "an arbitration award not challenged on its merits constituted a valid interpretation of the labor agreement and therefore could be treated 'as if' it represented an agreement 'as to the proper meaning' of the labor agreement." Appellee's Br. at 20. Nowhere did the Supreme Court hold that the arbitration award constituted "a valid interpretation" of the agreement. Rather, the Court treated the issue as one akin to waiver: "Eastern does not claim here that the arbitrator acted outside the scope of his contractually delegated authority. Hence we must treat the arbitrator's award as if it represented an agreement between Eastern and the union as to the proper meaning of the contract's words 'just cause.'" *E. Associated Coal*, 531 U.S. at 62 (citation omitted).

in the Supplemental Award. Supporting the Company's position is the Arbitrator's framing of the issue in the Original Award: "Did [the Company] violate the [1998] Agreement when [it] unilaterally made changes in the healthcare insurance benefits beginning on January 1, 2002?" Original Award at 4.

Yet, there are several indications that the prospective relief in the Original Award was intended and understood to extend beyond the 1998 CBA. As explained above, one of the relief provisions made no specific reference to the 1998 CBA: "Management is hereby directed to cease and desist from unilaterally increasing employees' share of healthcare insurance premium costs." *Id.* at 13. The omission by itself provides little insight. Yet, when considered in the context of the timing of the Original Award, the omission takes on greater significance. The Arbitrator issued the Original Award in March 2004, well after the expiration of the 1998 CBA. By definition, any forward-looking, "quasi-injunctive" relief awarded at that time must have had life beyond the date the 1998 CBA expired to avoid being a nullity. Simply put, the cease-and-desist directive makes little sense unless it extends to Company actions after April 26, 2002.

## III

Considering the Original Award as a bargained-for agreement between the parties, the court should reverse the district court. The Supplemental Award certainly draws its essence from the 1998 CBA and the Original Award. During the supplemental proceedings, the Arbitrator focused the issue on whether the remedies in the first award had been satisfied. The Arbitrator reasonably concluded that the terms of the Original Award called for prospective relief beyond a date that had already passed when the award was issued. Therefore, the Arbitrator had reason to look at evidence, including the terms and conditions of the 2002 CBA, to determine whether the Company had yet complied. Vacating the Administrator's Second Award interferes with the parties' bargained-for agreement, including the quasi-injunctive relief ordered under the Original Award. Accordingly, I dissent from the majority's decision to affirm the district court and to send this matter back for further arbitration proceedings.