155 F.3d 767
 159 L.R.R.M. (BNA) 2019, 136 Lab.Cas. P 10,228
 INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE
WORKERS (96-6404); Tennessee Valley Trades and
Labor Council (96-6404; 97-5146),
Plaintiffs-Appellees,
v.
TENNESSEE VALLEY AUTHORITY, Defendant-Appellant.
 Nos. 96-6404, 97-5146.
 United States Court of Appeals,
Sixth Circuit.
 Argued June 9, 1998.
Decided Aug. 24, 1998.
 
 Herbert S. Sanger, Jr. (argued and briefed), General Counsel, Charles W. VanBeke (briefed), Wagner, Myers, & Sanger, Knoxville, TN, for International Ass'n of Machinists and Aerospace Workers.
 R. Jan Jennings (argued and briefed), Branstetter, Kilgore, Stranch & Jennings, Nashville, Tennessee, for Tennessee Valley Trades and Labor Council.
 A. Jackson Woodall (briefed), Thomas F. Fine (argued and briefed), Sr. Litigation Atty., Linda J. Sales-Long (briefed), Tennessee Valley Authority, Knoxville, TN, for Tennessee Valley Authority.
 Before: KEITH, NELSON, and RYAN, Circuit Judges.
 KEITH, J., delivered the opinion of the court, in which RYAN, J., joined. NELSON, J. (pp. 772-775), delivered a separate dissenting opinion.OPINION
 KEITH, Circuit Judge.
 
 
 1
 Defendant, Tennessee Valley Authority, appeals the district court's judgment enforcing an arbitration award pertaining to the plaintiff's right to staff certain jobs with members of an international trade union, and denying Defendant's motion to vacate the award. For the reasons discussed below, we AFFIRM the lower court.
 
 I.
 
 2
 The following facts are adopted in part from the Memorandum of the District Court. Defendant-Appellant, Tennessee Valley Authority ("TVA"), was created in 1933. Plaintiff-Appellee, International Association of Machinists and Aerospace Workers ("IAM"), is an international trade union and the accredited representative of certain employees in various trades and labor classifications, including employees engaged in the maintenance and repair of heavy equipment used by TVA and some of its contractors. Plaintiff-Appellee, Tennessee Valley Trades and Labor Council ("TVTLC" or the "Council"), is an unincorporated association of six (6) international trade unions, including IAM, that represents a segment of TVA employees during the negotiation and execution of comprehensive collective bargaining agreements with TVA.[1] The six unions that are members of the Council are also members of the AFL-CIO.
 
 
 3
 In 1940, TVA and the original Council executed a formal collective bargaining agreement to cover TVA's "annual" employees in trades and labor classifications as represented by the unions that were members of TVTLC. This agreement, referred to as the "General Agreement and Supplementary Schedules," and encompassing both annual and hourly classifications, has been revised by TVA and TVTLC from time to time since its creation in 1940 up until May of 1991. Article IX of this General Agreement states that the rates paid to employees of contractors shall not be lower than the rates paid by TVA to its employees doing similar work.
 
 
 4
 Prior to 1991, TVA performed regular maintenance with its own employees and performed much of its needed construction, modification, and supplemental maintenance work by employing both annual employees and hourly employees. In 1991, TVA decided to contract out all construction, modification, and supplemental maintenance work that previously had been performed by its hourly (temporary) employees. At that time, TVA agreed with TVTLC to require that all contracts involving the employment of laborers and mechanics for more than $250,000.00 be performed using union labor under the terms of the project agreements to which the contractors, TVA, the Building and Construction Trades Department ("BCT") of the AFL-CIO, and the TVTLC unions are signatories. One of the two project agreements used is the Project Maintenance and Modifications Agreement for Work Performed for TVA ("PMMA"), which requires that the wages paid to employees of outside contractors be based on the prevailing wage for the vicinity and a formula agreed upon by the BCT Department of the AFL-CIO, the TVTLC, and TVA. The PMMA directs that any disputes over the prevailing wage rates "may" be referred to the Secretary of Labor, in accordance with Section 3 of the Tennessee Valley Authority Act.
 
 
 5
 In the early to mid-1980s, a dispute regarding the proper staffing of work designated as "Schedule B work" under the General Agreement arose between IAM and another TVTLC union, the International Union of Operating Engineers ("IOE"). Schedule B work consisted of regular maintenance work and miscellaneous operating work at TVA's operating and maintenance facilities, including the repair of equipment at TVA's Watts Bar Central Shop facility.[2] After many years of jurisdictional disputes between IAM and IOE the dispute was submitted to an arbitrator, Ed W. Bankston, by the Council for resolution under the Article VI procedures.[3] Arbitrator Bankston held a hearing on July 19, 1991 to determine the proper distribution of Schedule B work as it related to the two unions. On September 9, 1991, the arbitrator issued an initial award directing TVA to return all of the 110 jobs in dispute to IAM workers. The award allowed the parties sixty (60) days to fashion a transition agreement. The arbitrator also retained jurisdiction over the implementation of the award.
 
 
 6
 The parties mutually agreed upon and completed the transition for all but approximately forty (40) positions. After further failed negotiations, the parties provided position statements to arbitrator Bankston and requested a supplemental award to address the issue. On November 29, 1991, the arbitrator issued a supplemental arbitration award confirming the initial award and directing TVA to replace all remaining IOE workers with members of IAM, and give IAM workers "permanent annual" employment status.[4] The arbitrator again retained jurisdiction over implementation of the award.
 
 
 7
 Notwithstanding, in April 1992, TVA and TVTLC entered into a Framework Agreement which authorized TVA to eliminate the "hourly" employee bargaining unit by contracting out hourly work. Thereafter TVA failed to comply with the awards, contracting out the forty (40) remaining positions at the Watts Bar installation. Thereafter, the arbitrator held a subsequent hearing on March 23, 1993, and issued a second supplemental award on July 2, 1993. TVA objected for lack of jurisdiction and sought permission to submit that issue for the arbitrator to decide.
 
 
 8
 The arbitrator rejected TVA's insistence that it had fully complied with the awards, finding that TVA's actions were contrary to the intent of the initial award and that it was trying to circumvent the awards by outsourcing. According to the arbitrator, the 40 jobs contracted out by TVA were regular maintenance work performed under the General Agreement, not subject to the provisions of the 1992 Framework Agreement. The Framework Agreement was expressly applicable to the PMMA only.[5] The July 1993 award again directed TVA to staff the positions in dispute entirely with IAM members, and to "cease and desist" from further subcontracting regular maintenance work that was bargaining unit work, except for "emergency and short term situations to which the bargaining unit is non-responsive."
 
 
 9
 On August 6, 1993, IAM filed a civil action in the United States District Court for the Middle District of Tennessee, to enforce the initial and two supplemental arbitration awards, and for injunctive and other relief. TVA counterclaimed against TVTLC, seeking to vacate the two supplemental awards. According to TVA the Second Supplemental Award was void and unenforceable. The district court consolidated the two cases to allow all parties to present their positions on the award. TVA subsequently filed a motion for summary judgment to dismiss the plaintiffs' action, asserting the arbitrator failed to interpret the applicable bargaining agreement. On August 8, 1996, the district court denied TVA's motion for summary judgment and enforced the award of the arbitrator. This timely appeal followed.
 
 II.
 
 10
 On appeal, we review a district court's denial or grant of summary judgment de novo. Cox v. Kentucky Department of Transportation, 53 F.3d 146, 149 (6th Cir.1995). Summary judgment is appropriate only, where construing the evidence and all inferences in favor of the non-moving party, there is no genuine issue of material fact. Kraus v. Sobel Corrugated Containers, 915 F.2d 227, 229 (6th Cir.1990).
 
 
 11
 In the instant appeal, TVA contends the arbitrator's July 1993 Supplemental Award did not draw its essence from the relevant contractual agreement between TVA and TVTLC. TVA argues that the award was not consistent with the parties' rights under the collective bargaining agreement, and that as a result the arbitrator acted outside the scope of his authority.
 
 
 12
 It is well established that an arbitrator's award is legitimate only so long as it draws its essence from the collective bargaining agreement. United Steelworkers v. Enterprise Wheel & Car Corp., 363 U.S. 593, 597, 80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424 (1960). "When the arbitrator's words manifest an infidelity to this obligation," the arbitrator has exceeded the scope of his authority, and "courts have no choice but to refuse enforcement of the award." Id.
 
 
 13
 However, as the district court correctly noted, a court's review of an arbitrator's decision is very narrow; "one of the narrowest standards of judicial review in all of American Jurisprudence." Lattimer-Stevens v. United Steelworkers, 913 F.2d 1166, 1169 (6th Cir.1990). A court cannot make findings of fact independent of the arbitrator. The arbitrator must make the factual findings, "and a court may not reject those findings simply because it disagrees with them." United Paperworkers Int'l Union v. Misco, Inc., 484 U.S. 29, 38, 108 S.Ct. 364, 370-71, 98 L.Ed.2d 286 (1987).[6] Moreover, where "the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision." Id. Thus, an arbitrator's award may only be deemed to have not "drawn its essence" from the collective bargaining agreement when it "conflicts with express terms" of the agreement, "imposes additional requirements that are not expressly provided in the agreement," or "cannot be rationally derived from the terms of the agreement." Dobbs, Inc. v. Local No. 614, Int'l Bhd. Of Teamsters, 813 F.2d 85, 86 (6th Cir.1987). The arbitrator's award in the instant case does none of the above.
 
 
 14
 TVA contends the arbitrator's remedy does not draw its essence from the relevant bargaining agreements because its order improperly required TVA to recreate a bargaining unit for hourly employees. Specifically, TVA maintains that the General Agreement was silent as to outsourcing but that the April 1992 Framework Agreement, which was executed long after the dispute was presented to arbitration in July of 1991, authorized TVA to eliminate the hourly work force by contracting out unit work. Thus, TVA contends, the arbitrator's decision denying TVA the right to contract out its Schedule B work was in error.
 
 
 15
 TVA's argument, however, is essentially a challenge to the arbitrator's interpretation of the General Agreement and Framework Agreement. The arbitrator, before issuing the second Supplemental Award, considered TVA reports to the General Accounting Office, statements of TVA officials, and "uncontroverted testimony" at the arbitration hearing that Schedule B regular maintenance work would be performed only under the General Agreement and not by contract under the PMMA. The arbitrator's interpretation of the agreement clearly reflects the language of both the General Agreement and the Framework Agreement. Thus, we defer to the arbitrator's findings despite the possibility to interpret the agreements in the alternative. See Misco, 484 U.S. at 38, 108 S.Ct. at 370. Accordingly, the district court's denial of TVA's motion for summary judgment and subsequent enforcement of the arbitration award is affirmed.
 
 III.
 
 16
 TVA further asserts that the arbitrator did not have the authority to issue its July 1993 award, because the arbitrator lacked jurisdiction. According to TVA, the arbitrator's authority was limited to "defin[ing] the Schedule B 'job boundry line' between [IAM] and [IOE]," thus precluding the arbitrator from issuing a second Supplemental Award to "remedy" the disparity. Moreover, TVA argues that the adoption of the 1992 Framework Agreement eliminated the need for resolution by the arbitrator. These arguments are also unfounded.
 
 
 17
 An arbitrator's authority is not strictly confined to the "technical limits of the submission." Champion Int'l. Corp. v. United Paperworkers Int'l. Union, 779 F.2d 328, 335 (6th Cir.1985). "[T]he extraordinary deference given to an arbitrator's ultimate decision on the merits applies equally to an arbitrator's threshold decision that the parties have indeed submitted a particular issue for arbitration." Id. Thus, an arbitration award may not be overturned unless it is "clear" the arbitrator "exceeded the scope of the submission." Id.; see also International Chemical Workers Union Local No. 566 v. Mobay Chemical Corp., 755 F.2d 1107, 1110 (4th Cir.1985) (holding that the scope of issues submitted for arbitration may be broadened by the conduct of the parties during an arbitration).
 
 
 18
 The parties' submission of the Schedule B issue to arbitration under Article VI of the General Agreement vested the arbitrator with authority to "resolve" the dispute. Interstate Brands Corp. v. Chauffeurs, Teamsters Local 135, 909 F.2d 885 (6th Cir.1990). As the arbitrator expressly noted, the issue in dispute was "the proper distribution of Schedule B work as it relates to [IAM] and the [IOE]." Thus, any action by TVA affecting the resolution of the Schedule B assignments, including the outsourcing of the applicable positions, fell squarely within the scope of the arbitrator's authority. The arbitrator's Second Supplemental Award was not a determination as to whether TVA could contract out hourly work under the subsequent Framework Agreement. It was an enforcement of the initial resolution to the Schedule B work dispute, which TVA attempted to avoid. Accordingly, the district court's ruling as to the scope of the arbitrator's authority was correct and should be affirmed.
 
 IV.
 
 19
 For the foregoing reasons the decision of Judge Thomas A. Wiseman is AFFIRMED.
 
 
 20
 DAVID A. NELSON, Circuit Judge, dissenting.
 
 
 21
 Where a labor arbitrator's award "draws its essence" from a relevant collective bargaining agreement, and "the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority," it is clear that the courts must accept the award regardless of whether they happen to agree with the arbitrator's factual findings or even with his logic. United Paperworkers Int'l Union v. Misco, Inc., 484 U.S. 29, 36, 38, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987) (citations omitted). On this point there is no dispute between my colleagues and me.
 
 
 22
 But where the parties to the relevant collective bargaining agreement have agreed to the contract's termination, and the arbitrator, ignoring this fact, appears to have applied a contract covering a bargaining unit of which the aggrieved employees were not members, I question whether the arbitrator's award can properly be said to draw its "essence" from the relevant contract. I cannot be totally sure, given the Byzantine complexity of the TVA's collective bargaining arrangements, but it looks to me as though the arbitrator in the case at bar applied the wrong contract. In the course of doing so, I believe, he mandated the de facto resurrection of a bargaining unit that had been lawfully terminated by mutual agreement. I would therefore remand the case for reconsideration in light of circumstances of which TVA has probably given us a better explanation than it gave the arbitrator.
 
 
 23
 The pertinent background, as I understand it, is this. From at least the early 1970s until May of 1986, hourly-paid employees (also known as "temporary" or "hourly" employees) who worked on the maintenance and repair of TVA's power generating and transmission facilities were members of a collective bargaining unit that also included salaried employees. (The salaried employees are called "annual employees.")
 
 
 24
 As long as they were members of the same bargaining unit, the hourly employees and the annual employees were both covered by a collective bargaining agreement originally negotiated in 1940 and revised a number of times thereafter. The title page of the 1983 edition of this contract identified the instrument as the "GENERAL AGREEMENT ... And Supplementary Schedules.... COVERING ANNUAL AND HOURLY OPERATING AND MAINTENANCE EMPLOYMENT."
 
 
 25
 In 1986 the hourly employees were taken out of their former bargaining unit and placed in a separate unit consisting entirely of hourly employees. A separate collective bargaining agreement was negotiated for the new unit. The title page of the most recent edition of the collective bargaining agreement covering hourly employees is reproduced below:
 
 
 26
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 
 
 One of the "Supplementary Schedules" incorporated in this hourly collective bargaining agreement was called "Schedule B-hourly." It was "Schedule B-hourly," I gather, that defined the positions at issue in this litigation.
 In contradistinction to hourly employees, annual employees continued to be covered by the 1940 general agreement, as revised from time to time. The title page of the 1991 edition of the general agreement for annual employees looks like this:
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 It was this General Agreement--a contract that likewise had a Schedule B, but that covered only "ANNUAL OPERATING AND MAINTENANCE EMPLOYEES"--to which the arbitrator repeatedly referred, and from which he quoted, in his second supplemental award. The second supplemental award ordered that 40 hourly employees be reinstated with back pay.
 Nothing in the language of his award suggests that the arbitrator was even aware that there had been a separate general agreement covering hourly employees. We were assured at oral argument that, given his intimate familiarity with TVA's labor relations picture, the arbitrator must have known about the collective bargaining agreement for hourly employees. My confidence in the reliability of this assurance would be greater, I confess, if the arbitrator's award had contained at least a passing reference to the contract by which the hourly employees' conditions of employment had been governed since 1986.
 As I read the award, it clearly manifests an erroneous understanding that there was only one collective bargaining unit, covering both annual and hourly employees. Conditions of employment for that unit, the arbitrator evidently thought, were governed by one General Agreement. The arbitrator's mental image of TVA's bargaining unit structure was thus seven years out of date.
 Not only does the arbitrator seem to have been unaware that "the" bargaining unit to which he kept referring had long since been split in two, he seems also to have been unaware that there had been an agreement to abolish the hourly bargaining unit altogether. TVA did not explain this very well to the arbitrator, but in May of 1991, TVA tells us, the collective bargaining representative of the employees in the hourly bargaining unit agreed to the abolition of that unit and the termination of the general agreement covering hourly employees. The fact that termination was agreed to is undisputed. See, for example, the appellate brief of the International Association of Machinists and Aerospace Workers, which explicitly says that "the Original [Tennessee Valley Trades and Labor] Council agreed to eliminate its hourly bargaining unit agreement."[1]
 TVA's primary argument before the district court, we are told in the agency's brief on appeal, was that "the Council had agreed that TVA would eliminate its hourly bargaining unit and that contrary to the Council's specific agreement, the arbitrator ordered TVA to establish 40 hourly positions in the heavy equipment division, and pay backpay to the 40 individuals." This argument was never so much as mentioned in the district court's opinion.
 TVA could undoubtedly have done a better job than it did in presenting its argument to the arbitrator in the first instance. I am not persuaded, however, that TVA waived its right to make the argument before the courts.[2]
 The issue raised by TVA is a serious one, and it ought to have been addressed by the district court. It ought to have been addressed by the arbitrator as well. Because it was not, I am reluctant simply to affirm the decision in which the district court confirmed and enforced the arbitrator's award. The preferable course, it seems to me, would be to remand the case to the district court with instructions to return it to the arbitrator for reconsideration in light of the circumstances to which I have referred.
 
 
 [1]
 TVTLC was created in 1937, when fifteen unions organized in order to bargain with TVA on a centralized basis. Prior to May 9, 1991, the TVTLC represented all fifteen labor unions. On May 9, 1991, the original Council dissolved, and a new Council formed, now consisting in one form, as a six union "Annual Council" for purposes of the General Agreement. In addition, a "Project Agreement Council," was also formed, consisting of the fifteen unions formerly comprising the original TVTLC, and the six union members of the new TVTLC
 
 
 [2]
 Prior to 1979, the Operating Engineers had no representation in Schedule B work; it was all Machinists' work. Since 1979, however, the Operating Engineers have acquired approximately fifty per cent (50%) of the work at issue, leaving the Machinists with the remainder. The Machinists contended that their accommodation of the IOE into Schedule B work resulted in a wholesale redistribution of Machinists' jobs to Operating Engineers
 
 
 [3]
 Article VI of the General Agreement provides for the establishment of a Joint Maintenance Committee. The purpose of this committee is to resolve issues arising from disputes about the ratio of employees from each union that staffs TVA installations or work locations. If the staffing matter cannot be resolved by the Joint Committee, or the Vice President of Employee Relations, Article VI allows the matter to be referred to an impartial referee
 
 
 [4]
 The supplemental award proscribing "permanent annual" status to the IAM employees resulted from IAM allegations that TVA intended to eliminate many of the affected jobs by classifying the positions as "hourly" work, which would permit them to contract out the work to nonunion companies
 
 
 [5]
 Work under the General Agreement was not the same as work under the PMMA; particularly because TVA had agreed that no regular operating or maintenance work associated with ongoing operations would be performed under the PMMA
 
 
 [6]
 The federal policy of settling labor disputes by arbitration would be undermined were courts permitted to liberally review an arbitrator's decision on the merits. "It is the arbitrator's construction which was bargained for; and so far as the arbitrator's decision concerns construction of the contract, the courts have no business overruling him because their interpretation of the contract is different from his." Lattimer-Stevens, 913 F.2d at 1169
 
 
 [1]
 The majority opinion suggests that the agreement to eliminate the hourly bargaining unit was not reached until April of 1992, when TVA entered into a "Framework Agreement" with the new TVTLC. As the IAM brief notes, however, it was the "Original Council" that agreed to eliminate the hourly bargaining unit contract. This agreement could not have been reached after May of 1991 if, as stated in note 1 of the majority opinion, the original council dissolved on May 9, 1991
 
 
 [2]
 In a letter brief submitted to the arbitrator under date of April 27, 1993--more than two months before the second supplemental award was issued--TVA told the arbitrator, among other things, that:
 "With the full knowledge and acceptance by the Council, TVA decided to contract out all hourly trades and labor work instead of just some of it as had been the previous practice. In May 1991, TVA decided to cease using hourly trades and labor employees for any trades and labor work and to instead contract out that work. The enclosed articles and news releases describe that decision and the union acceptance of these arrangements.
 "While the Council recognized TVA's right to contract out that very work, TVA demonstrated good faith by negotiating at that same time two project labor agreements with the Council, which cover and are signed by contractors who are awarded contracts for trades and labor work which was formerly performed by hourly TVA trades and labor employees. Indeed, the presidents of the signatory unions, which comprise the Council, including the international president of the IAM, signed these Project Agreements.
 * * *
 "Since TVA no longer employs hourly employees of any craft and therefore there are no hourly craft bargaining units in TVA, there is no existing General Agreement for hourly employees."