RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 10a0304p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

EQUITABLE RESOURCES, INC.,

　　　　　　　　*Plaintiff-Appellant,*

　　v.

UNITED STEEL, PAPER AND FORESTRY,
RUBBER, MANUFACTURING, ENERGY, ALLIED
INDUSTRIAL AND SERVICE WORKERS
INTERNATIONAL UNION, AFL-CIO/CLC;
LOCAL 8-512,

　　　　　　　　*Defendants-Appellees.*

No. 08-6444

Appeal from the United States District Court
for the Eastern District of Kentucky at Pikeville.
No. 08-00151—Amul R. Thapar, District Judge.

Argued: March 11, 2010

Decided and Filed: September 16, 2010

Before: KENNEDY, MOORE, and SUTTON, Circuit Judges.

_____

## COUNSEL

**ARGUED:** J. Richard Hammett, BAKER & McKENZIE LLP, Houston, Texas, for Appellant. Daniel M. Kovalik, UNITED STEELWORKERS OF AMERICA, Pittsburgh, Pennsylvania, for Appellees. **ON BRIEF:** J. Richard Hammett, BAKER & McKENZIE LLP, Houston, Texas, Jaron P. Blandford, McBRAYER, McGINNIS, LESLIE & KIRKLAND, PLLC, Lexington, Kentucky, for Appellant. Daniel M. Kovalik, UNITED STEELWORKERS OF AMERICA, Pittsburgh, Pennsylvania, Adrienne A. Berry, SEGAL, LINDSAY & JANES, PLLC, Louisville, Kentucky, for Appellees.

　　MOORE, J., delivered the opinion of the court, in which SUTTON, J., joined. KENNEDY, J. (p. 21), delivered a separate concurring opinion.

1

———————

**OPINION**

———————

KAREN NELSON MOORE, Circuit Judge.  In this case under § 301 of the Labor Management Relations Act of 1947 ("LMRA"), 29 U.S.C. § 185, Equitable Resources, Inc. ("Equitable") challenges the district court's order enforcing an arbitration award entered in favor of the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO/CLC and its Local 8-512 (collectively, the "Union").  In early 2008, Equitable announced its plan to "integrate" the operations and employees of one of its wholly owned subsidiaries, Kentucky West Virginia Gas Company, L.L.C. ("Kentucky West") into two other wholly owned subsidiaries operating in Kentucky.  Following announcement of the integration, in June 2008 the Union filed suit in the United States District Court for the Eastern District of Kentucky to compel Equitable and Kentucky West to arbitrate successorship issues under the Union's then-current collective bargaining agreement with Kentucky West (the "CBA").  The CBA included a successorship clause stating that Kentucky West agreed to make any "sale, lease, transfer, or assignment" of "the operations covered by this Agreement" conditional upon the successor entity assuming the CBA.  The district court dismissed the Union's action after Equitable and the Union agreed to arbitrate the successorship issues under the CBA. Equitable moved forward with its corporate restructuring plan, and, effective July 1, 2008, Kentucky West ceased to exist.

Equitable, purporting to represent Kentucky West's interests, appeared at the arbitration.  On July 21, 2008, the arbitrator entered an award in favor of the Union that required Equitable to abide by the CBA until it expired in October 2008 (the "Award"). The arbitrator concluded as a matter of contract interpretation that the restructuring triggered the CBA's successorship clause and reasoned that Equitable could be liable under the clause for multiple reasons, including Equitable's status as the entity that

assumed Kentucky West's legal obligations after it ceased to exist July 1st, as Kentucky West's alter ego, and as the entity that received Kentucky West's operations after July 1st. Equitable then filed the instant complaint under § 301 of the LMRA to vacate or modify the Award, alleging multiple defects in the Award. The Union counterclaimed for enforcement of the Award and filed a cross-motion for summary judgment. The district court granted summary judgment in favor of the Union, enforcing the Award.

On appeal, Equitable argues that the district court erred in enforcing the Award because the arbitrator exceeded his authority in ordering Equitable, a non-party to the CBA, to honor the CBA as the remedy for Kentucky West's breach of the successorship clause, which resulted in multiple alleged defects in the Award. Guided by the highly deferential standard of review for arbitration awards that interpret a collective bargaining agreement outlined in *Michigan Family Resources, Inc. v. Service Employees International Union*, 475 F.3d 746 (6th Cir.) (en banc), *cert. denied*, 551 U.S. 1132 (2007), we affirm the district court's order enforcing the Award.

## I. FACTS AND PROCEDURE

The Union entered into the CBA with Kentucky West—defined as "a Delaware limited liability company and subsidiary of Equitable Resources, Inc."—effective October 16, 2003 through October 15, 2008. Doc. 8 (Answer), Ex. 1 (CBA at 1, 44). The CBA includes successorship language in Section 1 of Article II "RECOGNITION":

> The Company agrees that if during the life of this Agreement, it discontinues operations, sells, leases, transfers or assigns the operations covered by this Agreement, it shall inform the purchaser, lessee, transferee or assignees of the exact terms of this Agreement and shall make the sale, lease, transfer, or assignment conditional upon the purchaser, lessee, transferee, or assignee, assuming all the obligations of the Agreement until its expiration date and treating affected employees of the Bargaining Unit in accordance with the terms of this Agreement. The Company agrees to provide the Union with written notice when the transaction is complete and the Agreement is assumed.

*Id.* at 2. Article X "GRIEVANCE AND ARBITRATION" dictates the manner for resolving "any difference . . . between the parties or between any one or more of the employees and the Company relating to the meaning, application, or violation of any provisions of this agreement." *Id.* at 39. Article X further dictates the "Jurisdiction of [the] Arbitrator," stating, "The arbitrator shall have jurisdiction and authority only to interpret, apply, or determine compliance with the provisions of this agreement, and will not have authority to add to or detract or alter any provisions of this agreement. The arbitrator's decision will be final and binding on both parties." *Id.* at 40.

In early 2008, Equitable announced that it was undertaking a "corporate restructuring" for efficiency purposes that would eliminate Kentucky West and move its operations and employees to two wholly owned non-union subsidiaries of Equitable, Equitable Midstream and Equitable Productions (both of which had undergone operations changes prior to January 1, 2008). Under this plan, Kentucky West would cease to exist effective July 1, 2008. The Union filed a grievance with Kentucky West on March 7, 2008, and then an amended grievance on May 16. On May 23, 2008, Equitable responded to the Union, stating that the grievance was non-arbitrable. The Union then filed suit in the district court under § 301 of the LMRA, requesting a preliminary injunction to stay the restructuring and compel arbitration with Kentucky West so that the Union would be able to arbitrate with Kentucky West or Equitable without either party being able to argue that arbitration was no longer available under the CBA. After telephonic conference calls with the district court, the parties agreed to settle by submitting the case to arbitration, and the Union withdrew its suit.

Arbitration was held on July 8, 2008. As stated in the Award, the question presented to the arbitrator was: "Did the Company [Kentucky West] violate the collective bargaining agreement when it refused to secure an assurance from its parent company, Equitable Resources, Inc.[,] that the agreement would be honored after the Company's assets were transferred to a new entity? If so what shall the remedy be?" Doc. 8 (Answer), Ex. 5 (Award at 2). The arbitrator found that the predecessor language to Article II, Section 1 that was included following negotiations in 2000 made it "clear

and unambiguous on its face [that it] . . . applies to any such wholesale transfer of work" and that "[o]n its face this applies to both external and internal transfers." *Id.* at 11. The arbitrator concluded that "it was clear that insofar as this contract was concerned, the prospect of th[is] very sort of internal transfer was contemplated by the terms of Article II. The clear understanding was that this was a condition precedent to this transfer and that Equitable understood and agreed to this as well." *Id.* at 19.

The arbitrator found that "[i]t is of some significance that while [Kentucky West] is referenced in the preamble as the 'Company' it is also identified as a 'subsidiary of Equitable Resources, Inc.'" *Id.* at 12. The arbitrator found that

> What was clear was that Equitable representatives sat at the negotiating table, participated in the negotiations actively and in fact were in reality the ones making most if not all of the decisions regarding the substantive terms of the labor agreement in the bargaining leading up to the current labor agreement.
> What is also clear, and this too was not controverted by the Company at the hearing, is that at least for purposes of these negotiations, the two Companies acted very much as though they were one. Certainly as a factual determination, it was quite clear that Equitable knew and agreed to the terms of the labor agreement and it was based on that expression of agreement that the Union signed the current labor agreement.

*Id.* at 18–19 (citation omitted). The arbitrator reviewed and distinguished prior arbitrations between Kentucky West and the Union and concluded that none dictated the outcome here because none had dealt with a similar situation that fell squarely within Article II, Section 1 as a transfer of the entire operations of Kentucky West to another entity. *Id.* at 12–18.

The arbitrator supported his ability to arbitrate the dispute after Kentucky West ceased to exist under *John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543 (1964), *NLRB v. Burns International Security Services, Inc.*, 406 U.S. 272 (1972), and *Howard Johnson v. Detroit Joint Executive Board HERE*, 417 U.S. 249 (1974). *Id.* at 20–25. In his discussion, the arbitrator in part premised his ability to bind Equitable to the CBA on the theory that Equitable was the successor entity and had agreed to be bound by the CBA

during its negotiations—"Here it was clear that Equitable directed and was responsible for the merger with [Kentucky West] and that its representatives sat at the bargaining table and negotiated the successorship clause which by its very terms purports to bind Equitable as a condition precedent to the merger." *Id.* at 22, 35 (referring to Equitable "as the successor employer to [Kentucky West]"). The arbitrator also found that Equitable was Kentucky West's alter ego—"it is determined that even though the two corporations are legally separate, Equitable was in fact, for purposes of the negotiations leading to the CBA and for this determination the alter ego of [Kentucky West] and was therefore expressly bound by the terms of the successorship clause found at Article II, section 1 of the parties' labor agreement." *Id.* at 29. The arbitrator found "fairly transparent" Equitable's "argument that the 'parent' company really did this is [sic] and therefore cannot be bound by the agreements its wholly owned subsidiary agreed to in good faith at the bargaining table." *Id.* at 35.

> The arbitrator ultimately concluded that
>
> The terms [of Article II, Section 1] apply to *any* transferee, such as a subsidiary of Equitable and it frankly makes no difference what entity the assets are sold to or merged with. The contract is hereby interpreted to apply as a condition precedent to any such transfer including one to another Equitable subsidiary.
> . . . .
> The only logical reading of the language of Article II section 1 is that even if the parent made the decision to require [Kentucky West] to transfer it[s] assets, either inside or outside of the Equitable stable of companies, the conditions precedent to such a transfer would be for [Kentucky West] to assure that the terms of the agreement were honored. . . . This again is a matter of contract and the clear terms requiring such assurance *prior* to the transfer.
> Accordingly, for the reasons stated herein, it is determined that the plain and unambiguous terms of the agreement at Article II section 1 required Equitable, as the successor employer to [Kentucky West], to honor all of the terms and conditions of the labor agreement between [Kentucky West] and the Union herein until its expiration on October 15, 2008 for the former [Kentucky West] employees covered under that agreement.

*Id.* at 34–35.

Equitable filed the instant suit in the district court on August 1, 2008, seeking to vacate the Award. The Union counterclaimed for enforcement and filed a motion for summary judgment; Equitable filed a cross-motion for summary judgment. The district court granted summary judgment to the Union and affirmed the Award "[f]or the reasons stated on the record and for those provided by the [Union] in their briefs." Doc. 25 at 1 (Dist. Ct. Minute Entry & Order). Equitable timely appeals from the district court's summary-judgment order.[1]

## II.  ANALYSIS

Equitable claims that the Award is defective for four separate reasons. First, Equitable asserts that the arbitrator acted outside of his authority by imposing the CBA on non-parties. Second, Equitable asserts that the arbitrator necessarily resolved a labor representation dispute not committed to arbitration. Third, Equitable argues that the remedy the Award dictates will violate public policy in implementation. And finally, Equitable contends that the arbitrator "dispensed his own brand of industrial justice." We will address, and reject, each of Equitable's contentions in turn.

### A.  Standard of Review

"This [c]ourt reviews a district court's grant of summary judgment in a labor arbitration dispute *de novo*," applying the same standard of review that we employ in other summary judgment cases. *Totes Isotoner Corp. v. Int'l Chem. Workers Union Council/UFCW Local 664C*, 532 F.3d 405, 410 (6th Cir. 2008). However, we afford great deference to the arbitrator's decision:

> In an appeal from an arbitrator's decision interpreting a collective
> bargaining agreement, our review is confined to ascertaining whether the
> arbitrator erred. In doing so, we apply the highly deferential standard of

---

[1]The district court entered a subsequent order remanding the matter to the arbitrator for clarification of the CBA's expiration date pursuant to the Union's timely Rule 59(e) motion. The district court then ruled that its summary-judgment order was a final and appealable order not displaced by this later remand order, and Equitable filed its notice of appeal from the summary-judgment order. (The propriety of the remand order is not before us on appeal.) We have jurisdiction to review the summary-judgment order. *M & C Corp. v. Erwin Behr GmbH & Co., KG*, 326 F.3d 772, 779–81 (6th Cir. 2003).

> *Michigan Family Resources* and uphold the arbitrator's decision so long
> as she was "arguably construing or applying the contract" and was not
> disqualified by fraud or a conflict of interest.

*Nance v. Goodyear Tire & Rubber Co.*, 527 F.3d 539, 551 (6th Cir. 2008) (quoting *Mich. Family Res., Inc. v. Serv. Employees Int'l Union*, 475 F.3d 746, 753 (6th Cir.) (en banc), *cert. denied*, 551 U.S. 1132 (2007)), *cert. denied*, 129 S. Ct. 1319 (2009).  We must affirm the arbitrator's decision even if we believe that "'the arbitrator made "serious," "improvident" or "silly" errors in resolving the merits of the dispute,'" which "allow[s us] to vacate 'only the most egregious [arbitral] awards.'"  *Id.* at 552 (quoting *Mich. Family Res.*, 475 F.3d at 753) (second alteration in original).  For disputes required to be arbitrated under a collective bargaining agreement, "the underlying 'question of contract interpretation [is] for the arbitrator.'"  *Mich. Family Res.*, 475 F.3d at 750 (quoting *United Steelworkers v. Am. Mfg. Co.*, 363 U.S. 564, 568 (1960)).  Keeping in mind our very "'limited role' when the losing party to an arbitration seeks judicial intervention,'" *id.* at 752 (quoting *United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 36 (1987)), our scope of review is confined to answering three questions related to "procedural aberration":

> Did the arbitrator act "outside his authority" by resolving a dispute not committed to arbitration?  Did the arbitrator commit fraud, have a conflict of interest or otherwise act dishonestly in issuing the award?  And in resolving any legal or factual disputes in the case, was the arbitrator "arguably construing or applying the contract"?

*Id.* at 753.  "[W]here it is contemplated that the arbitrator will determine remedies for contract violations that he finds, courts have no authority to disagree with his honest judgment in that respect."  *Misco*, 484 U.S. at 38.

**B.  The Arbitrator Did Not Exceed His Authority by Creating Parties to the CBA**

"An arbitrator does not exceed his authority every time he makes an interpretive error; he exceeds that authority only when the collective bargaining agreement does not commit the dispute to arbitration."  *Mich. Family Res.*, 475 F.3d at 756.  This approach

"'severely curtail[s] the scope of authority concept'" such that an award should not be vacated unless "an arbitrator reaches a question not committed to him by the parties." *Totes Isotoner*, 532 F.3d at 414–15 (quoting *Truck Drivers Local No. 164 v. Allied Waste Sys.*, 512 F.3d 211, 217 (6th Cir. 2008) (internal quotation marks omitted)). Equitable does not argue that the arbitrator exceeded his authority in finding that Kentucky West breached the CBA, and indeed conceded this at the summary judgment hearing. Doc. 27 (Summ. J. Tr. at 14–15). Instead, Equitable argues that the arbitrator exceeded his authority in ordering Equitable to honor the CBA as the remedy for Kentucky West's breach because Equitable is not a party to the CBA. *Id.* at 61. The district court rejected this argument, concluding that "[e]ven if wrong in determining the terms or parties to the contract, that is a legal error" that the court could not fix. *Id.* at 89. The district court further found that the arbitrator's factual finding that Equitable agreed to step into the shoes of Kentucky West for purposes of the arbitration and any remedy was supported,[2] and that this finding of fact was made as part of the arbitrator's contract interpretation. *Id.* at 89–92. The district court concluded that Equitable put the question of whether it was bound by the CBA "clearly, squarely before the arbitrator and he rejected [Equitable's argument]." *Id.* at 92.

The Award states the question presented to the arbitrator as: "Did the Company [Kentucky West] violate the collective bargaining agreement when it refused to secure an assurance from its parent company, Equitable Resources, Inc.[,] that the agreement would be honored after the Company's assets were transferred to a new entity? If so what shall the remedy be?" Doc. 8 (Answer), Ex. 5 (Award at 2). In its complaint, Equitable stated that

> The primary issues at the arbitration were: (1) whether the core issues
> of representation raised by the Union's grievance render it unarbitrable;

---

[2]Before the district court, Equitable maintained that Kentucky West was the entity that was arbitrating with the Union because Equitable had sent representatives on behalf of Kentucky West, which ceased to exist as a legal entity after July 1, so that Kentucky West could "fulfill[] its obligation" as the party to the CBA. Doc. 27 (Summ. J. Tr. at 4–5) ("Equitable was there on behalf of its former subsidiary, because any contractual, any legal obligations that Kentucky West had under the collective bargaining agreement, Equitable was standing in the shoes of Kentucky West for that purposes [sic], but it was not expanding the collective bargaining agreement to cover anyone other than Kentucky West.").

(2) whether Kentucky West breached Article II Section 1 of the . . . CBA when Equitable imposed a corporate-wide restructuring; and (3) if a breach is found, whether there are any monetary damages for the time period from July 1, 2008 through October 15, 2008.

Doc. 1 (Compl. at 3). The Union stated in its motion for summary judgment that the parties effectively submitted four questions to the arbitrator:

(1) Whether the dispute was arbitrable? (2) Whether the [CBA] or its successorship provisions bound the parent company, Equitable and/or its other non-union subsidiaries, as well as its subsidiary [Kentucky West]? (3) [W]hether the [CBA] was violated by the transaction at issue? and (4) [I]f Equitable or [Kentucky West] had violated their obligations under the agreement, what should the remedy be?

Doc. 14 (Union Summ. J. Mot. at 4–5 (citations omitted)). These statements reflect the issue statements each party submitted to the arbitrator in their pre-hearing briefs.

We conclude that the arbitrator's determination that Equitable could be held liable under the terms of the CBA was a question of contract interpretation that the parties submitted to the arbitrator. The errors that Equitable alleges the arbitrator made are errors of law based on findings of fact—that the arbitrator could not have entered the Award if he had correctly interpreted the contract under precedent. However, the arbitrator repeatedly stated that his conclusions were grounded in his interpretation of the contract. *See, e.g.*, Doc. 8 (Answer), Ex. 5 (Award at 26) ("[T]his matter is one which remains a matter of contract: did Equitable agree to be bound by the terms of the existing labor agreement between the Union and [Kentucky West]."). The Award "has all the hallmarks of interpretation[;] [h]e refers to, quotes from and analyzes the pertinent provisions of the agreement, and at no point does he say anything indicating that he was doing anything other than trying to reach a good-faith interpretation of the contract." *Mich. Family Res.*, 475 F.3d at 754. The arbitrator reasoned that Equitable could be liable under Article II, Section 1 for multiple reasons, including as the entity that assumed Kentucky West's legal obligations after it ceased to exist July 1st, as Kentucky West's alter ego, and as the entity that received Kentucky West's operations after July 1st. Contrary to Equitable's contention, the arbitrator's interpretation of the CBA did

not actually make Equitable or others a "party" to the CBA; the arbitrator determined in his interpretation of the CBA that the parties intended Article II, Section 1 to be triggered by the instant transaction and that Equitable, through Kentucky West, was bound by these terms.

First, the arbitrator interpreted Article II, Section 1 to manifest clearly the intent of the parties—the Union, Kentucky West, and Equitable, as a participant in the CBA negotiations and prior negotiations—that any internal or external transfer of Kentucky West's operations would require Kentucky West to secure compliance with Article II, Section 1 as a condition precedent, regardless of who or what was the "successor" entity. Doc. 8 (Answer), Ex. 5 (Award at 11–12). With this interpretation, the arbitrator determined that Kentucky West violated the provision when Equitable's restructuring took place. The arbitrator then had to determine who was liable for this violation. The arbitrator addressed and distinguished all of the prior arbitration awards and NLRB rulings that Equitable cites on appeal. *Id.* at 12–18 ("It is significant that in none of the prior awards was the complete and total loss of the unit involved. . . . Here the question is whether the terms of the agreement must be honored by the successor entity as a precondition of the sale. As discussed herein, there is no limitation on whether the successor entity is internal or external[;] the integration cannot occur without the provisions of Article II being triggered."); *id.* at 30–31. Distinguishing "a true arms length transaction," the arbitrator specifically found that Equitable "knew and agreed to the terms of the [CBA]," that the contract contemplated the type of internal transfer at issue, and that "[t]he clear understanding was that [Article II, Section 1] was a condition precedent to this transfer and that Equitable understood and agreed to this as well." *Id.* at 19. The arbitrator rejected Equitable's argument that representational issues precluded arbitrability, finding support under Supreme Court precedents to arbitrate the dispute after Kentucky West ceased to exist. *Id.* at 20–25.

We acknowledge that the arbitrator was influenced by the facts and circumstances here—"that the successor through its actions and express statements made by its authorized representatives at the bargaining table in fact did agree to b[e] bound

by the terms of the predecessor's labor agreement and did in fact assume those responsibilities." *Id.* at 21, 23–24. But, as the arbitrator concluded,

> this case is not governed necessarily by operation of law or by NLRB precedent, although those considerations are relevant, *it is governed by the terms of the contract agreed to by the parties.* The one fact that comes through this case like a bolt of lightening [sic] is that the parties negotiated for this very scenario and agreed, with Equitable representatives a part of that[] agreement, that the terms of the CBA would be honored. The bottom line on this entire case is that the collective bargaining agreement survived the merger between [Kentucky West] and Equitable because the parties, including Equitable, *agreed* that it would.

*Id.* at 25 (first emphasis added). Further, the arbitrator found that

> the essential facts in this case demonstrate a very clear intent that Equitable as the parent company of [Kentucky West] in the first place and the surviving company for all the [Kentucky West] operations and all of its employees intended through the operation of the successorship clause to be bound by it[s] terms for the former [Kentucky West] employees. This does make it a matter of contractual interpretation and thus appears to invoke the Courts' authority to order arbitration under the contract.

*Id.* at 27. Even with his finding that Equitable was liable as the parent and legal successor, the arbitrator proceeded to find that Equitable had both an express and implied obligation to honor the terms of the prior agreement as the successor based on the "clear contractual terms" and "the facts" of the negotiations. *Id.* at 32. Although Equitable is correct that the arbitrator did point to evidence from the 2000 negotiations, the arbitrator prefaced his reference to this evidence with language showing that he understood its limited evidentiary value, stating that it merely supported his earlier findings interpreting the CBA.[3] *Id.* at 33–34.

---

[3]We note that this is consistent with the Second Circuit's recognition that a non-signatory to an agreement to arbitrate may be bound by an arbitral award if the signatory can "'establish at least one of the five theories described in *Thomson-CSF*[, *S.A. v. American Arbitration Association*, 64 F.3d 773, 776 (2d Cir. 1995)]:' '1) incorporation by reference; 2) assumption; 3) agency; 4) veil-piercing/alter ego; and 5) estoppel.'" *Local Union No. 38, Sheet Metal Workers' Int'l Ass'n v. Custom Air Sys., Inc.*, 357 F.3d 266, 268 (2d Cir. 2004) (quoting *Merrill Lynch Inv. Managers v. Optibase*, 337 F.3d 125, 131, 129 (2d Cir. 2003) (internal quotation marks and alteration omitted)) (vacating and remanding for threshold

From our review of the Award, we conclude that the arbitrator was "arguably construing or applying the contract" in the manner he deemed required to resolve the dispute the parties placed before him. *See Mich. Family Res.*, 475 F.3d at 753 (internal quotation marks omitted). Any legal or factual errors that the arbitrator may have committed related to "alter ego" status or "successor" terminology[4] were related to his contract interpretation and application attempts and did not exceed his authority. "[W]hen 'an arbitrator resolves disputes regarding the application of a contract, and no dishonesty is alleged, the arbitrator's improvident, even silly, factfinding does not provide a basis for a reviewing court to refuse to enforce the award.'" *Id.* at 752 (quoting *Major League Baseball Players Ass'n v. Garvey*, 532 U.S. 504, 509 (2001) (internal quotation marks omitted)).

Without considering the concessions that the Union has urged us to accept regarding Equitable's representation of Kentucky West before the district court and the arbitrator, we conclude that the arbitrator did not exceed the scope of his authority in determining whether Equitable was liable for Kentucky West's breach under the CBA once he determined that a breach of the CBA did occur. "[W]hen a contract is scrutinized for evidence of an intention to arbitrate a particular kind of dispute, national labor policy requires, within reason, that an interpretation that covers the asserted dispute be favored." *John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543, 550 n.4 (1964) (internal quotation marks omitted); *id.* at 554 (finding that specific arbitration issues can raise a broader question of the effect of a merger). Further, "[t]he extraordinary deference given to an arbitrator's ultimate decision on the merits applies

---

determination of whether non-signatory was alter ego).

[4] Even if we could review the arbitrator's legal conclusion, we would do so under the "'more relaxed, less exacting' application of the alter ego doctrine [used] '[i]n order to effectuate federal labor policies.'" *Yolton v. El Paso Tenn. Pipeline Co.*, 435 F.3d 571, 587, 586–89 (6th Cir.) (quoting *NLRB v. Fullerton Transfer & Storage Ltd., Inc.*, 910 F.2d 331, 336 (6th Cir. 1990)) (second alteration in original), *cert. denied*, 549 U.S. 1019 (2006). "To determine alter ego status in this situation, courts ask 'whether the two enterprises have substantially identical management, business, purpose, operation, equipment, customers, supervision and ownership.'" *Id.* at 587 (quoting *Fullerton Transfer & Storage Ltd.*, 910 F.2d at 336). In *Yolton*, we noted that "even when a reorganization is supported by legitimate reasons, the employer may be prevented from avoiding its prior labor obligations." *Id.* at 587 n.14; *see also Southward v. S. Cent. Ready Mix Supply Corp.*, 7 F.3d 487, 493–97 (6th Cir. 1993) (discussing cases regarding alter ego and successorship).

equally to an arbitrator's threshold decision that the parties have indeed submitted a particular issue for arbitration." *Int'l Ass'n of Machinists & Aerospace Workers v. Tenn. Valley Auth.*, 155 F.3d 767, 772 (6th Cir. 1998) (internal quotation marks omitted).

Because it is not "clear" that the arbitrator exceeded the scope of the issue submitted in determining whether Equitable could be liable for the breach, we cannot overturn the Award on this basis.  *Id.*  This dispute is not one that is without any basis in the CBA.  *See Mich. Family Res.*, 475 F.3d at 753; *Dobson Indus., Inc. v. Iron Workers Local Union No. 25*, 237 F. App'x 39, 47 (6th Cir. 2007) (unpublished opinion) (upholding arbitration award because making the contested determination was "a reasonable way to determine whether that party is violating that clause" and is "arguably construing" the contract); *Peterbilt Motors Co. v. UAW Int'l Union*, 219 F. App'x 434, 436–38 (6th Cir. 2007) (unpublished opinion).  The Award represents the arbitrator's legal and factual findings under the CBA—"an arbitrator's award may only be deemed to have not drawn its essence from the collective bargaining agreement when it conflicts with express terms of the agreement, imposes additional requirements that are not expressly provided in the agreement, or cannot be rationally derived from the terms of the agreement." *Int'l Ass'n*, 155 F.3d at 771 (internal quotation marks omitted).  Any ambiguity in the collective bargaining agreement "permitted, indeed required, the arbitrator to engage in construction of the agreement, which is all we are asked to determine." *Mich. Family Res.*, 475 F.3d at 755.  Even if we concluded "[t]hat he chose the wrong path in justifying the award" that would "not give us a warrant to vacate it." *Id.*  Therefore we conclude that the arbitrator did not exceed the scope of his authority by interpreting the CBA in a way that allowed Equitable to be found liable for the breach.

**C.    The Arbitrator Did Not Exceed His Authority to Resolve Representational Questions**

Although the arbitrator rejected Equitable's argument that representational issues precluded arbitrability, Equitable asserts that the arbitrator necessarily had to decide representational issues to create the specific-performance remedy, and that

representation issues are outside of an arbitrator's authority and thus were not within the scope of the issue presented. "Although the federal courts without question indulge in a presumption in favor of arbitration, the arbitrator, in determining arbitrability, is constrained by the principle that a party may not be forced to arbitrate any dispute that it has not, by contract, obligated itself to arbitrate." *Peterbilt Motors Co.*, 219 F. App'x at 436 (citing *Mich. Family Res.*, 475 F.3d at 750–51; *United Steelworkers v. Mead Corp.*, 21 F.3d 128, 131 (6th Cir. 1994)). The arbitrator is not "free to invent contract provisions that will support a finding of arbitrability." *Id.* at 437.

The district court found that the arbitrator made a legal decision to treat the issue of whether Equitable was bound as a successor as a contract interpretation issue and not as a representational issue under labor law. Doc. 27 (Summ. J. Tr. at 92–93). Indeed, the arbitrator repeatedly stated that he was dealing with a question of contract interpretation—"this matter is one which remains a matter of contract: did Equitable agree to be bound by the terms of the existing labor agreement between the Union and [Kentucky West]." Doc. 8 (Answer), Ex. 5 (Award at 26). We agree with the arbitrator's conclusion that he did not necessarily have to decide the representation issues Equitable raised in order to interpret the CBA and impose a remedy because the arbitrator imposed specific performance on Equitable as the stand-in for Kentucky West. Contrary to Equitable's contention, our unpublished opinion in *Dobson Industrial, Inc. v. Iron Workers Local Union No. 25* does not require the opposite conclusion. In construing the contract in *Dobson*, the arbitrator determined that it must also determine whether an alter ego relationship existed, which the company asserted raised an impermissible representation issue that the arbitrator decided against the company. *Dobson Indus.*, 237 F. App'x at 44–46. However, because the potential representation issue arose within the contract interpretation, we concluded in *Dobson* that the arbitrator's decision "drew its essence from the contract" and, in light of a broad arbitration clause similar to the one in the CBA here, the issue could be decided in arbitration. *Id.* at 46. The same reasoning applies here. As the district court found, the arbitrator only ordered Equitable to honor the CBA, and "[i]t's for the company to figure

out in that scenario how to do it legally" without running afoul of majority status or unit appropriateness issues.  Doc. 27 (Summ. J. Tr. at 55).

Moreover, that an arbitrator may have "implicitly" decided a representational issue does not necessarily mean that he exceeded his authority because collateral representational issues may remain outside the NLRB's exclusive jurisdiction.  "When a dispute is 'primarily representational' under § 7 or § 8 of the National Labor Relations Act, 'simply referring to the claim as a "breach of contract" [is] insufficient for the purposes of § 301 federal courts' jurisdiction,' but 'matter[s] primarily of contract interpretation, whi[ch] potentially implicat[e] representational issues,' remain within the federal courts' § 301 jurisdiction."  *Int'l Bhd. of Elec. Workers, Local 71 v. Trafftech, Inc.*, 461 F.3d 690, 694–95 (6th Cir. 2006) (quoting *Paper, Allied-Industrial, Chem. & Energy Workers Int'l Union v. Air Prods. & Chems., Inc.*, 300 F.3d 667, 672, 675 (6th Cir. 2002)) (alterations in original).  There are "two types of situations in which a dispute will be treated as primarily representational:  where the Board has already exercised jurisdiction over a matter and is either considering it or has already decided the matter, or where the issue is an initial decision in the representation area."  *Id.* at 695 (internal citations, quotation marks, and alteration omitted).  As in *Trafftech*, in the instant case "the arbit[rato]r need not resolve the representational dispute to determine whether [the company] has violated its collective bargaining agreement."  *Id.* at 695–96.  The Union does not question whether it may represent the non-union employees of the other subsidiaries, and it did not ask the arbitrator to decide whether this was possible or to require Equitable to bargain with the Union for ongoing representation.[5]  The issue was whether Equitable could be liable for Kentucky West's violation of the existing CBA and not whether future representation was possible.  *See Air Prods. & Chems.*, 300 F.3d at 675–76, 677–78; *see also John Wiley & Sons*, 376 U.S. at 551 & n.5 (holding that a union without majority status in the newly merged company could still represent employees in arbitration under former agreement).  The fact that Equitable sees potential

_____

[5]At oral argument, the Union confirmed that it was not seeking to assert or determine its rights to represent other employees in the future beyond the scope of the CBA at issue in this litigation.

representation issues in the remedy does not preclude the remedy, and Equitable may still present such issues to the NLRB. *See Trafftech*, 461 F.3d at 694, 697.

Therefore we conclude that the arbitrator did not exceed the scope of his authority to decide a representational issue in this case because the arbitrator's successor decision was permissible in furtherance of his interpretation of the CBA.

**D. The Award's Remedy Does Not Violate Public Policy**

Equitable next contends that the specific-performance remedy ordered in the Award violates public policy by requiring recognition of a minority bargaining unit by a non-party, in violation of the public policy in the National Labor Relations Act ("NLRA"), specifically 29 U.S.C. § 159 (§ 9 of the NLRA). The "narrow" public policy exception makes an arbitration award unenforceable if it is contrary to an "'explicit,' 'well defined,' and 'dominant'" public policy that is "'ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests.'" *E. Associated Coal Corp. v. United Mine Workers, Dist. 17*, 531 U.S. 57, 62–63 (2000) (quoting *W.R. Grace & Co. v. Local Union 759, Int'l Union of United Rubber, Cork, Linoleum & Plastic Workers*, 461 U.S. 757, 766 (1983) (internal quotation marks omitted)). The question is whether the actual arbitration award—the enforcement of the interpretation of the CBA—violates public policy, not whether the breach of the labor agreement or the potential actions that could be taken in response to the award violate public policy. *Id.*; *Shelby County Health Care Corp. v. Am. Fed. State, County & Mun. Employees, Local 1733*, 967 F.2d 1091, 1096 (6th Cir. 1992); *see also Columbia Gas of Ohio, Inc. v. Util. Workers Union*, 329 F. App'x 1, 4–5 (6th Cir. 2009) (unpublished opinion). We "tak[e] the facts as found by the arbitrator" in "determin[ing] whether the arbitrator's interpretation of the contract jeopardizes a well-defined and dominant public policy." *Int'l Union, UAW v. Dana Corp.*, 278 F.3d 548, 558 (6th Cir. 2002) (internal quotation marks omitted).

As we stated above, the Award clearly "'draws its essence from the contract.'" *Mich. Family Res.*, 475 F.3d at 752 (quoting *Misco*, 484 U.S. at 38). The arbitrator

found that the Union and Kentucky West included successorship language in the CBA that would require Kentucky West to condition any transaction such as the one at issue here on the continuation of the CBA. The Award merely requires Equitable, as the stand-in for Kentucky West, to honor this mandate and be liable for its breach. Equitable does not argue that Article II, Section 1 is unenforceable as a violation of public policy, or that there is no legal way to fulfill its mandate or the award. *See W.R. Grace & Co.*, 461 U.S. at 769 n.13 (recognizing that specific performance of collective bargaining agreement term would violate public policy because in violation of federal discrimination laws, but upholding arbitration award of damages for breach of contract). We conclude, as did the district court,[6] that the arbitrator "was acting well within the bounds" of the CBA. *See Shelby County Health Care*, 967 F.2d at 1096–97 (finding award that followed mandate of company's agreement with union did not violate public policy). The Award does not grant the Union any rights to future representation, bargaining status, or other such rights attendant to the NLRA. Indeed, it might be against public policy not to enforce the successorship clause.[7] *See NLRB v. Burns Int'l Sec. Servs., Inc.*, 406 U.S. 272, 282–83 (1972) ("'[T]he essence of collective bargaining is that either party shall be free to decide whether proposals made to it are satisfactory.'"

---

[6] The district court rejected this argument because Equitable had agreed, prior to arbitration, that it would step into Kentucky West's shoes for purposes of the Union's potential remedy. Doc. 27 (Summ. J. Tr. at 94–95). During the summary judgment hearing, the district court disagreed with Equitable's argument that the remedy effectively ordered Equitable to act in violation of federal labor law to recognize a minority bargaining unit, finding that the arbitrator had only ordered Equitable to honor the CBA and "[i]t's for the company to figure out in that scenario how to do it legally." *Id.* at 55. The district court found that the arbitrator interpreted the contract to determine whether a breach occurred under its terms, and then imposed a remedy of specific performance on Equitable as the successor entity who had agreed to stand in the shoes of Kentucky West. *Id.* at 32–35, 52–53, 58.

[7] Although Equitable argues that it would be against public policy to require a *new* employer to follow a predecessor's collective bargaining agreement if the requisite majority status and unit appropriateness are lost, even if the new employer voluntarily assumed the agreement, *see Burns Int'l Sec. Servs.*, 406 U.S. at 278–85, here the arbitrator based the Award on the fact that Equitable was acting as Kentucky West for purposes of the arbitration and the remedy, not merely the new employer. *See Eisenmann Corp. v. Sheet Metal Workers Int'l Ass'n Local No. 24*, 323 F.3d 375, 381–85 (6th Cir. 2003) (holding that arbitration award that enforced terms of company's agreement with union did not violate public policy by extending agreement to non-union workers); *see also John Wiley & Sons*, 376 U.S. at 551 & n.5 (holding that a union without majority status in the newly merged company could still represent employees in arbitration under former agreement even though "[p]roblems might be created by an arbitral award which required [the new company] to give special treatment to the former [company's] employees because of rights found to have accrued to them under the [union] contract," because such hypothetical problems could be avoided by a solution "within the flexible procedures of arbitration"). Equitable has not cited any binding precedent to support its position on this issue.

(quoting S. Rep. No. 74-573, at 12 (1935))); *id.* ("'The theory of the Act is that free opportunity for negotiation with accredited representatives of employees is likely to promote industrial peace and may bring about the adjustments and agreements which the Act in itself does not attempt to compel.'" (quoting *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 45 (1937))); *see also W.R. Grace & Co.*, 461 U.S. at 771 (recognizing "the federal labor policy that parties to a collective bargaining agreement must have reasonable assurance that their contract will be honored"). Under the circumstances, we cannot agree that the Award's remedy violates public policy.

**E. The Arbitrator Did Not "Dispens[e] His Own Brand of Industrial Justice"**

For many of the same reasons stated above, we cannot agree with Equitable's contention that the arbitrator's decision is tainted by a "results-driven" approach that makes the Award unenforceable. "'[O]nly when the arbitrator strays from interpretation and application,' . . . does he enter the forbidden world of 'effectively dispens[ing] his own brand of industrial justice,' making the arbitrator's decision 'unenforceable.'" *Mich. Family Res.*, 475 F.3d at 752 (quoting *Garvey*, 532 U.S. at 509 (internal quotation marks omitted)) (alterations in original). The danger of imposing "industrial justice" may arise if "the arbitrator's decision on the merits was so untethered from the agreement that it casts doubt on whether he was engaged in interpretation." *Id.* at 754.

As stated above, we conclude that the arbitrator's decision is supported by his interpretation of the contract.

> That the deciphering of this contract required implications and inferences suffices by itself to show that the arbitrator was permissibly engaged in interpretation. . . . *It was the "arbitrator's construction," not three layers of federal judicial review, that the parties "bargained for,"* and that delegation of decision-making authority must be respected even when time and further review show that the parties in the end have bargained for nothing more than error.

*Id.* at 756 (emphasis added). Here, the arbitrator repeatedly stated that he was dealing with a question of contract interpretation, and the arbitrator's remedy is related to his

interpretation of the CBA and necessarily flows from his finding that a requirement to honor the CBA was a condition precedent to the transaction. Because the transaction had occurred without the condition precedent, the arbitrator ordered specific performance of the CBA to place the Union in the position it would have been had Article II, Section 1 been honored prior to the transaction.

We are also unpersuaded by Equitable's argument that the Award dispensed the arbitrator's own brand of industrial justice by ignoring arbitral precedent. We decline to employ the strict application of arbitral res judicata that Equitable urges because our precedent instructs "that absent a contractual provision to the contrary, the preclusive effect of an earlier arbitration award is to be determined by the arbitrator." *Dana*, 278 F.3d at 557. The arbitrator here followed our suggestion to "[a]s a practical matter, . . . take into consideration prior arbitration decisions involving the same provision of the collective bargaining agreement." *Id.* So long as the current arbitrator's interpretation draws its essence from the contract, the arbitrator may disagree with a prior arbitral decision. *Id.* Here, the arbitrator discussed each prior arbitral decision at length and distinguished both the issues and factual scenarios involved from the current case. Thus, we also reject Equitable's final argument for vacating the Award.

### III.  CONCLUSION

We conclude that the district court did not err in granting summary judgment to the Union and enforcing the Award here, in light of the great deference afforded to determinations made by arbitrators. For the foregoing reasons, we **AFFIRM** the judgment of the district court.

---

**CONCURRENCE**

---

CORNELIA G. KENNEDY, Circuit Judge, concurring.  I concur with the majority opinion.  I write separately to note that we are not deciding that there are ongoing equitable obligations on Equitable.